J-S94026-16

2017 PA Super 100

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| JOSHUA MICHAEL LUKACH | No. 693 MDA 2016 |

Appeal from the Order April 5, 2016
in the Court of Common Pleas of Schuylkill County
Criminal Division at No(s): CP-54-CR-0001710-2015

BEFORE:  LAZARUS, J., RANSOM, J., and FITZGERALD, J.[*]

OPINION BY RANSOM, J.:                          **FILED APRIL 11, 2017**

The Commonwealth of Pennsylvania appeals from the order of April 5, 2016, granting in part Appellee Joshua Michael Lukach's suppression motion.[1]  After careful review, we affirm.

The relevant facts and procedural history of this case are as follows. **See** Suppression Court Opinion (SCO), 4/2/16, at 2-18.[2]  On August 6,

---

[1] The Commonwealth certifies that the order suppressing evidence in this case substantially handicaps the prosecution of this case.  **See** Pa.R.A.P. 311(d).

[2] The interrogation of Appellee was videotaped, and a copy included in the certified record.  Due to the poor quality of the audio track, both Appellee and the Commonwealth submitted a joint transcription which was included in the certified record.  We have reviewed both the tape and transcription.  The suppression court opinion relies heavily on, and incorporates, the transcription.

[*] Former Justice specially assigned to the Superior Court.

2015, at approximately 5:00 a.m., Police Chief Richard Wojciechowsky of the Pottsville Bureau of Police was called to a crime scene at South 12th Street in Pottsville. Upon arriving, he discovered that John Brock's body had been found in the street. Police recovered a pair of white gloves from the alley behind Mr. Brock's home, a wallet from Mr. Brock's dresser, and a bank card on the bedroom floor. Chief Wojciechowsky received information indicating that Appellee and Shavinskin Thomas were persons of interest in the homicide and that they had previously been involved in a crime at Mr. Brock's home. Two officers reported seeing Appellee and Mr. Thomas walking near the crime scene at approximately 6:00 a.m. that morning.

At 11:00 a.m., Chief Wojciechowsky observed Appellee and Mr. Thomas near the crime scene. He asked Appellee what he was doing in the area, and Appellee responded that he was checking what was going on. Appellee claimed that on the preceding evening, he and Mr. Thomas walked around the city together, stopping at an A-Plus store around 5:00 a.m. A Pottsville police officer went to the store and reviewed security footage from the relevant time. Still photographs were taken of the two customers present in the store; however, neither was Appellee.

Around 5:00 p.m. that evening, Appellee's mother consented to a search of her home. Police recovered box cutters from Appellee's bedroom, aware that box cutters had been used in the murder. Police also recovered a pair of white work gloves which were similar to gloves found in the alley behind Mr. Brock's home.

- 2 -

On August 7, 2015, Appellee was arrested on two outstanding summary offense warrants and brought to City Hall for questioning. Chief Wojciechowsky advised Appellee of his **Miranda**[3] rights, and Appellee acknowledged he understood them. Chief Wojciechowsky questioned Appellee about his whereabouts on the night of the murder. At 1:25 p.m., Appellee informed Chief Wojciechowsky, "I don't know, just, I'm done talking. I don't have nothing to talk about." **See** TCO at 12.

Instead of taking this as a request to end the conversation, Chief Wojciechowsky advised Appellee that he did not have to speak to police, stating, "You don't have to say anything, I told you that you could stop." However, Chief Wojciechowsky continued to ask questions, told Appellee that he did not believe his story, and informed Appellee that police officers had collected evidence from the crime scene for processing. At 1:36 p.m., police officers confiscated Appellee's shoes. Chief Wojciechowsky continued to pepper Appellee with questions.

At 1:52 p.m., Appellee requested that Chief Wojciechowsky stop the video tape. At 1:57 p.m., Chief Wojciechowsky turned the videotape back on and asked Appellee whether he had been threatened, yelled at, or promised anything while the tape was off. Appellee responded that he had not. Appellee then requested to speak to a representative of the District

---

[3] **Miranda v. Arizona**, 86 S. Ct. 1602 (1966).

Attorney's Office in exchange for a potential "deal."  The video stopped again at 2:00 p.m., and the prosecutor arrived at 2:23 p.m., at which time the video was turned on again.[4]  Appellee was again advised of his *Miranda* rights by Chief Wojciechowsky.

Subsequently, Appellee gave a detailed statement to police, confessing his involvement in the murder.  As a result of Appellee's statement, police obtained video surveillance of Appellee accessing an ATM on the morning of the homicide.  Police also recovered from a storm drain the following evidence: the victim's credit card, hat, shirt, and sunglasses.

Appellee was charged with murder.  Prior to trial, he filed an omnibus pre-trial motion, seeking to suppress statements made to police after he stated that he "[did not] want to talk" and was "done talking."  The motion also sought to suppress evidence recovered as a result of Appellee's statements, including Appellee's shoes.

Hearings were held January 12, 2016, and January 13, 2016.  Chief Wojciechowsky testified that he did not interpret Appellee's statements as an immediate invocation of the right to remain silent and wanted to "be absolutely certain that [Appellee] was still aware of that right."  Detective Kirk Becker testified that if the credit card had not been recovered from the

_____

[4] The record is silent as to what occurred during that time.  In contrast to the earlier break, Chief Wojciechowsky did not question Appellee about the intervening time upon restarting the tape at 2:23 p.m.

storm drain, police could have obtained the ATM footage regardless through credit checks and by subpoenaing Mr. Brock's account access records.

On April 5, 2016, the court issued an order granting Appellee's motion in part. The court suppressed statements made by Appellee following his assertion that he was done talking; Appellee's shoes and any evidence obtained from them; and the items recovered from the storm drain. The court admitted all statements made prior to Appellee's assertion that he was done talking and surveillance video from the ATM machine.

The Commonwealth timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The suppression court issued a responsive opinion adopting its April 5, 2016 opinion and order.

On appeal, the Commonwealth raises three issues for our review:

1. Did the suppression court err in finding that the Appellee made a clear and unambiguous assertion of his right to remain silent during police questioning?

2. Did the suppression court err in finding that the police violated Appellee['s] Fifth Amendment privilege against self-incrimination and thus err in suppressing incriminating statements made to police?

3. Did the suppression court err in suppressing certain physical evidence (credit card, hat, shirt, and sunglasses) as fruit of the poisonous tree?

Commonwealth's Brief at 5.

When the Commonwealth appeals from a suppression order:

we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Miller*, 56 A.3d 1276, 1278–79 (Pa. Super. 2012).

The Commonwealth first claims that the trial court erred in suppressing Appellee's statement because his invocation of his right to remain silent was not clear and unambiguous. *See* Commonwealth's Brief at 9. The Commonwealth argues that the statement was wavering, qualified, and left police unsure as to Appellee's intentions. *Id.*

A suspect is entitled to *Miranda* warnings prior to a custodial interrogation. *Commonwealth v. Boyer*, 962 A.2d 1213, 1216 (Pa. Super. 2008) (noting that defendant's statement "I don't want to talk to you" was an invocation of his *Miranda* rights). If a suspect "indicates, in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Commonwealth v. Henry*, 599 A.2d 132, 1323 (Pa. Super. 1991) (internal citations omitted). However, the United States Supreme Court has held that the invocation of the right to remain silent or request an attorney must be affirmative, clear, and unambiguous. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259-60 (2010); *see also Commonwealth v. Briggs*, 12 A.3d 291, 318 n.27 (Pa. 2011) (noting that

the Supreme Court has held that an individual in police custody subject to interrogation must affirmatively invoke his or her *Miranda* rights).

In *Berghuis*, the defendant was silent during the first two hours and forty-five minutes of a three-hour interrogation. *Berghuis*, 130 S. Ct. at 2256-57. He did not state that he wished to remain silent, that he did not want to talk to the police, or that he wanted an attorney. *Id.* However, towards the end of the interrogation, a police officer asked defendant whether he prayed to God to forgive him for the shooting, to which the defendant responded, "Yes." *Berghuis*, 130 S. Ct. at 2257. The defendant refused to sign a written confession and argued that his statement to detectives should have been suppressed because he had invoked his right to remain silent. *Id.* The United States Supreme Court affirmed the denial of defendant's motion to suppress, holding that the invocation of the right to remain silent must be affirmative, clear, and unambiguous. *Berghuis*, 130 S. Ct. at 2260. The defendant's silence, without an affirmative invocation or statement, did not suffice. *Id.*

Pennsylvania courts have addressed *Berghuis* in passing but have not directly discussed its applicability. For example, in *Briggs*, the defendant argued that the trial court should have suppressed his spontaneous confession to police and averred he had not been given his *Miranda* warnings. *Briggs*, 12 A.3d at 318-19. In a footnote, the Court referenced the *Berghuis* holding and acknowledged the defendant's request to speak to

- 7 -

a lawyer was an invocation of those rights. *Id.* at n.27. However, the Court concluded that the conversation with police officers had not constituted an interrogation and accordingly, *Miranda* protections did not attach. *Id.* at 323-24. Similarly, *Commonwealth v. Guess* also cites *Berghuis* in a footnote. *See Commonwealth v. Guess*, 53 A.3d 895, 901-02, n.15 (Pa. Super. 2012). There, the defendant argued that evidence should be suppressed because he was unlawfully detained prior to his arrest. *Id.* Although the defendant did not challenge statements made to the police during a mere encounter, the Court observed in a footnote that silence by the accused does not provide an unambiguous signal to the police that the accused has invoked Fifth Amendment protections. *Guess*, 53 A.3d at 902 n.15.

The Commonwealth also directs our attention to *Commonwealth v. Champney*, 65 A.3d 386 (Pa. 2013) (plurality). In that case, an evenly split Pennsylvania Supreme Court affirmed the trial court's grant of a suppression motion. *Id.* The defendant argued that the words, "I think I want to talk to [my attorney] before I make a statement," were a clear and unambiguous invocation of his right to counsel. *See Champney*, 65 A.3d at 387-89. The opinion in support of affirmance agreed, finding that the phrase, "I think," was colloquially used to express beliefs and did not render the request ambiguous. *Id.* (citing *United States v. Davis*, 114 S. Ct. 2350 (1994)). The opinion in support of reversal contended that *Davis* was inapposite as,

in that case, the defendant had clarified that he did not really want an attorney, and the **Davis** Court had merely deferred to the lower court's finding of ambiguity. **See Champney**, 65 A.3d at 400. The opinion in support of reversal contended that **Berghuis** controlled and the defendant's statement was not unequivocal. **Id.**

Here, there is no dispute that Appellee was advised of his **Miranda** rights at the outset of questioning. The question is whether or not his statement, "I don't know, just, I'm done talking. I don't have nothing to talk about" was a clear and unequivocal invocation of his right to remain silent, pursuant to **Berghuis**. We hold, under the facts of the case, that it was.

The Commonwealth relies upon a number of decisions from other state and federal jurisdictions to support its contention that Appellee's statement was ambiguous.[5] **See United States v. Adams**, 820 F.3d 317 (8th Cir. 2016) (finding that defendant's statement "I don't want to talk, man" was ambiguous because of an immediate subsequent statement "I mean" was meant to explain the previous statement); **United States v. Havlik**, 710 F.3d 818, 822 (8th Cir. 2013) (noting that statements "I guess you better get me a lawyer" and "Could I call my lawyer" were ambiguous because a

---

[5] This Court "is not bound by the decisions of federal courts, other than the United States Supreme Court, or the decisions of other states' courts . . . [H]owever, we may use them for guidance to the degree we find them useful and not incompatible with Pennsylvania law." **Eckman v. Erie Ins. Exch.**, 21 A.3d 1203, 1207 (Pa. Super. 2011) (internal citation omitted).

reasonable officer would have understood the suspect to be asking about the right to call a lawyer."); ***Owen v. Florida Dept. of Corrections***, 686 F.3d 1181, 1194 (11th Cir. 2012) (finding that defendant's statements "I'd rather not talk about it" and "I don't want to talk about it" in response to specific questions were ambiguous where defendant continued to speak to police); ***State v. Cummings***, 850 N.W.2d 915 (Wis. 2014) (discussing the difference between "I don't want to talk about this" and "I don't know nothing about this"). As will be discussed below, none of these decisions are binding precedent on this Court, nor do they implicate similar statements or situations to the instant case.[6]

For example, the ***Havlik*** Court found the defendant's statement, "I guess I need to get [a lawyer]," insufficient to trigger the obligation to cease questioning, because a reasonable police officer could have understood the suspect to be inquiring whether he had the right to call a lawyer. ***See***

_____

[6] In contrast, the Commonwealth also cites a number of cases as examples of clear and unequivocal statements. We would note that they are more in line with Appellee's statement than with the previous examples. ***See Boyer***, 962 A.2d at 1218 (holding that "I don't want to talk to you" was an invocation of the right to remain silent); ***see also Garcia v. Long***, 808 F.3d 771 (9th Cir. 2015) (finding that "no" in response to question "do you wish to talk to me" was a clear assertion of ***Miranda*** rights); ***United States v. Lee***, 413 F.3d 622 (7th Cir. 2005) (finding clear assertion of right to counsel where defendant asked "Can I have a lawyer?"); ***Smith v. Illinois***, 105 S. Ct. 490, 495 (1984) (holding that an accused's post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself).

*Havlik*, 710 F.3d at 821. Here, Appellee made a clear statement that he did not wish to talk anymore. The *Owen* court found that defendants' two statements, "I'd rather not talk about it," were made thirty minutes apart, in responses to questions about very specific details and were not indications that the defendant wished to stop talking, but did not want to provide details on discrete issues, though the defendant was otherwise willing to talk and continued talking after his first request. *Owen*, 686 F.3d at 1193-94. Here, Appellee made the request in response to general questioning and indicated his desire to cease speaking to Chief Wojciechowsky. That request was not honored. Finally, Appellee cites to *State v. Cummings*, which noted that the statement, "I don't want to talk about this," indicated a desire to cut off questioning while "I don't *know* nothing about this" was an exculpatory statement proclaiming innocence, which the *Cummings* court found incompatible with a desire to cut off questioning. *Cummings*, 850 N.W.2d at 928. In that case, the defendant made both statements alternately while continuing to respond to police questioning, unlike the instant case.

The Commonwealth takes issue with every part of Appellee's statement, including the words, "I don't know," "I'm done talking," and "I don't have anything to talk about." *See* Commonwealth's Brief at 10-18. The Commonwealth argues that the statement was not "clean and clear" and suggests that Appellee should have said solely "I don't want to talk to you." *Id.* at 13. This suggests a bright line rule that does not take into account

- 11 -

the surrounding circumstances of the case, nor the entire context of Appellee's statement. Although ineloquently phrased, Appellee's statements were not qualified. They were not ambiguous. They were not equivocal. In response to continued questioning, Appellee stated, "I don't know, just, I'm done talking. I don't have nothing to talk about." *See* TCO at 12. This was the sort of statement that would lead a reasonable police officer, in those circumstances, to understand the statement to be a request to remain silent. *See*, *e.g.*, *Champney*, 65 A.3d at 387.

We decline to adopt the rigid, bright line rule for invocation suggested by the Commonwealth. Accordingly, we conclude that Appellee invoked his right to remain silent and the suppression court did not err in finding that he had made a clear and unambiguous invocation. *See Berghuis*, 130 S. Ct. at 2260.

Next, the Commonwealth claims that the suppression court erred in finding that police had violated Appellee's Fifth Amendment privilege against self-incrimination. *See* Commonwealth's Brief at 9. The Commonwealth contends that Appellee made a conscious and knowing decision to confess, and that his confession was not coerced. *Id.*

While *Miranda* protections prohibit the continued interrogation of an interviewee in custody once he has invoked his right to remain silent, further interrogation does not constitute a *per se* violation of that right. *See Commonwealth v. Bess*, 789 A.2d 757, 762 (Pa. Super. 2002); *see also*

*Commonwealth v. Russell*, 938 A.2d 1082, 1090 (Pa. Super. 2007). A suppression court reviewing a statement made after the initial invocation of the right to remain silent must consider:

> [t]he circumstances attending the defendant's invocation of his or her right to silence, as well as the circumstances attending any further attempt at questioning. Hence, the test should ask whether the official purpose of resuming questioning was to entice the arrestee to abandon his right to remain silent, or simply to find out whether he or she had a change of mind. Only then can it be concluded whether, in fact, the defendant's right to cut off questioning was scrupulously honored.

*Henry*, 599 A.2d at 1325.

*Henry* adopted the requirement that police "scrupulously honor" a defendant's request from *Michigan v. Mosley*, 96 S. Ct. 321 (1975), which held that law enforcement officials must respect a person's exercise of the option to terminate questioning in order to counteract the coercive pressure of the custodial setting. *Mosley*, 96 S. Ct. at 327 (finding that Mosley's right to cut off questioning was fully respected where police officers immediately ceased interrogation and did not try to resume questioning or persuade Mosley to reconsider his position). The analysis regarding whether police scrupulously honored defendant's request focuses on:

> (1) whether the defendant was advised of her *Miranda* rights before both interrogations; (2) whether the officer conducting the first interrogation immediately ceased the questioning when the defendant expressed his desire to remain silent; and (3) whether the second interrogation occurred after a significant time lapse, and whether it was conducted in another location by another officer.

*Russell*, 938 A.2d at 1090-91.

It is the Commonwealth's burden to establish that a defendant knowingly and voluntarily waived his *Miranda* rights. *Commonwealth v. Cohen*, 53 A.3d 882, 885–86 (Pa. Super. 2012). A defendant must explicitly waive his *Miranda* rights by making an outward manifestation of that waiver. *Id.* The determination of whether the waiver is valid depends on:

> (1) whether the waiver was voluntary, in the sense that defendant's choice was not the end result of governmental pressure, and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice.

*Commonwealth v. Mitchell*, 902 A.2d 430, 451 (Pa. 2006).

If the totality of the circumstances reveals an uncoerced choice and the requisite level of comprehension, a court may properly find that *Miranda* rights have been waived. *See*, *e.g.*, *Commonwealth v. Martin*, 101 A.3d 706, 724 (Pa. 2014);[7] *Commonwealth v. Cephas*, 522 A.2d 63,

---

[7] Factors this Court may consider include: "the means and duration of the interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof; the length of the accused's detention prior to the confession; whether the accused was advised of his or her constitutional rights; the attitude exhibited by the police during the interrogation; the accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated; the conditions attendant to the detention, including whether the accused was deprived of food, drink, sleep, or medical attention; the age, education, and intelligence of the accused; the experience of the accused with law enforcement and the criminal justice system; and any other factors which
*(Footnote Continued Next Page)*

65 (Pa. Super. 1987) (finding that defendant's schizophrenia rendered him unable to knowingly and voluntarily waive his **Miranda** rights).

Finally, when considering a confession obtained after illegal conduct by police officers, the relevant factors the court considers when determining whether the original taint has been sufficiently purged include: (1) whether **Miranda** warnings were again administered; (2) the "temporal proximity" of the illegal police conduct to the confession; (3) the presence of intervening circumstances or events; and (4) the purpose and flagrancy of the official misconduct. **See Commonwealth v. Burno**, --- A.3d ---, *16 (Pa. 2017) (citing **Commonwealth v. Green**, 581 A.2d 544, 550-51 (Pa. 1990)).

Further, the United States Supreme Court has held, in a companion case to **Miranda**, that officials may not benefit from the coercive interrogation of other officers, and that belated warnings are not sufficient to protect a defendant. **Westover v. United States**, 86 S. Ct. 1602, 1639 (1966). In **Westover**, the defendant was arrested and questioned through the night and into the next morning without being apprised of his right to remain silent and his right to counsel. **Westover**, 86 S. Ct. at 1639. The next day, Federal Bureau of Investigation ("FBI") agents took over the interrogation, gave the defendant advisory warnings, and proceeded to

*(Footnote Continued)* ─────────

might serve to drain one's powers of resistance to suggestion and coercion." **See Martin**, 101 A.3d at 724-25.

- 15 -

question him regarding crimes committed in another state. *Id.* After two hours of questioning, the defendant confessed to those crimes. *Id.* The *Westover* Court held that the confession obtained by the FBI was inadmissible, as the interrogation leading to that statement followed on the heels of prolonged questioning commenced in violation of the defendant's rights, and that the defendant was unable to knowingly and intelligently waive his rights. *Id.* The belated warnings were "not sufficient" to protect the defendant, and the FBI could not benefit from the pressure applied during the previous interrogation. *Id.*

With these principles in mind, we first consider the period of time between Appellee's invocation of his right to remain silent and the point at which he requested to speak to the district attorney. As noted above, continued interrogation does not constitute a *per se* violation of a defendant's Fifth Amendment right. *See Bess*, 789 A.2d at 762. We consider the circumstances surrounding the invocation, the interrogation, and whether the police officers scrupulously honored that request. *Henry*, 599 A.2d at 1325. In the instant case, Appellee stated that he was "done talking," but Chief Wojciechowsky continued to interrogate him for another thirty minutes. *See* TCO at 11-16. This interrogation included informing Appellee that police officers were recovering evidence from the scene as well as pressuring him to confess. *Id.* During this time period, Appellee's shoes

were taken from him so that evidence could be gathered from them, further heightening the coercive nature of this continued interaction. *Id.*

From these circumstances, we cannot conclude that police scrupulously honored Appellee's request to remain silent. *Henry*, 599 A.2d at 1325. Further, there was no pause in the interrogation; it continued in the same location, by the same police officer. *Russell*, 938 A.2d at 1091. Accordingly, all statements made by Appellee and evidence recovered from Appellee during this time period were properly suppressed.

However, the Commonwealth argues that Appellee's subsequent inculpatory statement should not be suppressed because his Fifth Amendment rights were not violated. *See* Commonwealth's Brief at 9. The Commonwealth asserts that because Appellee was read his *Miranda* rights prior to speaking to the district attorney, he voluntarily waived them, curing the taint of the previous illegal interrogation. *Id.* Appellee disputes this assertion, suggesting that the interview conducted by Chief Wojciechowsky was overly coercive and that any waiver made by Appellee was presumptively invalid as a result. *See* Appellee's Brief at 15-25. Accordingly, considering the totality of the circumstances, we must also determine whether Appellee's waiver was valid. *Martin*, 101 A.3d at 724-25; *Green*, 581 A.2d at 51.

First, we note the illegal conduct of the police. As discussed, *supra*, Appellee invoked his right to remain silent, and this right was not

scrupulously honored by police. *See Henry*, 599 A.2d at 1325; *Russell*, 938 A.2d at 1090-91. To the contrary, Chief Wojciechowsky continued to pepper Appellee with accusations and questions, kept up without pause. *See* TCO at 11-15 (continued questioning focused on evidence recovered from the crime scene and Appellee's mother's home; Chief Wojciechowsky's questioning was focused on obtaining a confession from Appellee by telling him that if he was truthful, people would want to help him).

Next, we note the timing of Appellee's interrogation. The interrogation began at approximately 1:05 p.m. *See* TCO at 7. Appellee invoked his right to remain silent twenty minutes later. *See* TCO at 12. Chief Wojciechowsky continued to interrogate him for approximately thirty minutes prior to Appellee's request to speak to the district attorney. *See* TCO at 12-15. Chief Wojchiechowsky then turned off the camera for twenty minutes until the prosecutor arrived. *See* TCO at 17. In total, only twenty minutes passed between the illegal conduct and the confession, and as noted above, the record is silent as to what occurred during that time.

Thus, due to the coercive nature of the circumstances and the impact of the continuous period of questioning, Appellee did not knowingly and voluntarily waive his *Miranda* rights. *See Westover*, 86 S. Ct. at 1639 (noting that despite warnings given at the outset of a continued interview, from the defendant's point of view, warnings were given at the end of the

interrogation process). Accordingly, the suppression court properly ruled that Appellee's statement was inadmissible.

Finally, the Commonwealth argues that the suppression court erred in suppressing physical evidence obtained as a result of Appellee's confession as fruit of the poisonous tree. *See* Commonwealth's Brief at 5. The Commonwealth avers that a violation of Appellee's Fifth Amendment right is not the same as a violation of *Miranda*. *Id.* at 24. Accordingly, the Commonwealth argues that non-testimonial evidence derived from the statement is still admissible. *Id.* at 24-26.

"The 'fruit of the poisonous tree' doctrine excludes evidence obtained from, or acquired as a consequence of, lawless official acts." *Commonwealth v. Brown,* 700 A.2d 1310, 1318 (Pa. Super. 1997). Such an argument requires an antecedent illegality. *See Commonwealth v. Johnson*, 68 A.3d 930, 946 (Pa. Super. 2013); *see also Commonwealth v. Abbas*, 852 A.2d 606, 610 (Pa. Super. 2004). Further,

> [w]e need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Commonwealth v. Loughnane*, 128 A.3d 806, 815 (Pa. Super. 2015) (citation omitted).

As discussed above, Appellee's inculpatory statements were not voluntarily made and were properly suppressed. Accordingly, evidence obtained as a result of the statements, unless from a means sufficiently distinguishable to be purged of the primary taint, was properly suppressed. *Loughnane*, 128 A.3d at 815. The suppression court held, based on the record, that the Commonwealth had not provided sufficient grounds to determine how the evidence at issue, including Appellee's shoes and various items recovered from a storm drain near the victim's home, would have been found absent Appellee's statement. We see no error in this conclusion and, accordingly, affirm. *Miller*, 56 A.3d at 1278–79.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/11/2017