J-S54006-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA MICHAEL LUKACH | : | |
| | : | |
| Appellant | : | No. 634 MDA 2019 |

Appeal from the Judgment of Sentence Entered March 27, 2019
In the Court of Common Pleas of Schuylkill County Criminal Division at
No(s):  CP-54-CR-0001710-2015

BEFORE:  BOWES, J., LAZARUS, J., and DUBOW, J.

MEMORANDUM BY BOWES, J.:                **FILED NOVEMBER 25, 2019**

Joshua Michael Lukach appeals from the judgment of sentence of life imprisonment imposed following his conviction of second-degree murder, burglary, criminal trespass, and access device fraud.  We affirm.

The trial court provided a thorough summary of the facts underlying this appeal:

> [Appellant] was charged by the Pottsville Bureau of Police with the murder of John Brock whom a neighbor had found lying on a street in the City of Pottsville, Schuylkill County [, Pennsylvania] shortly before 4:00 a.m. on August 6, 2015.  Mr. Brock – having suffered from multiple wounds including a severe laceration to his throat and stab or slicing wounds to his chest, stomach, abdomen, back, legs and arms – died as a result of the injuries.  Police were dispatched at 3:50 a.m. that day and arrived within minutes at the scene as did emergency medical personnel. Police saw and followed a trail of blood which led from Mr. Brock's body into his nearby home and to a second floor bedroom.  Police found a bloody, disheveled bedroom, a broken knife and box cutter on the second floor and bloody smudges and/or glove imprints leading from the second floor to the first floor kitchen and

then to the basement of the home, with the bloody marks continuing to the outside rear of the home and to a fence. Behind the Brock home police found a set of wet bloody gloves. Forensic testing later established that the bloody gloves contained the DNA of both Mr. Brock and [Appellant].

Police recovered photographic and video evidence of [Appellant] being depicted by a Pottsville Susquehanna Bank ATM camera utilizing a bank card of Mr. Brock between 5:09 a.m. and 5:12 a.m. on August 6, 2015, a little over one hour after the discovery of Mr. Brock's body. After finalizing a $63.00 transaction, [Appellant] was shown on the video depiction wiping the bank machine with his shirt in an apparent attempt to remove fingerprints. Thereafter, [Appellant] and Shavinskin Thomas, who was also charged with the murder of Mr. Brock, were depicted entering the A-Plus mini-market in Pottsville at 5:14 a.m., eating at a counter in the store and leaving the store at 5:51 a.m. Police not only saw a person running away from the area of Mr. Brock's house in the direction of the homes of [Appellant] and Thomas prior to being dispatched to the scene but they encountered [Appellant] and Thomas walking the streets of Pottsville prior to 6 a.m. and then about 11:15 a.m. near the scene where Mr. Brock had been discovered.

Thomas, who had entered a guilty plea to, [inter alia], third[-]degree murder and been sentenced pursuant to a plea agreement with the Commonwealth, testified that prior to the murder he and [Appellant] had planned to rob Mr. Brock, had gone to and entered the Brock home to do so the early morning of August 6, 2015, had held Mr. Brock down on his bed demanding that he tell them where his money was and that he provide to them the PIN of his credit card. When Mr. Brock did not promptly tell the assailants the information they sought, Thomas stabbed or sliced Mr. Brock's body repeatedly. Upon receiving the PIN information, [Appellant] used Mr. Brock's cellphone (which belonged to his employer) to receive confirmation of the accuracy of the information. Telephone records presented into evidence indicated that calls to Wells Fargo and the Money Network had been made from the victim's phone at 3:27 a.m., 3:28 a.m., and 3:30 a.m. on August 6, 2015.

Thomas testified that during the assault he cut Mr. Brock numerous times before he slit Mr. Brock's throat at [Appellant's] urging. Because Mr. Brock put up a struggle and the knife Thomas

- 2 -

was using was ineffectual in hurting Mr. Brock further, [Appellant] gave Thomas another knife which Thomas then used to stab Mr. Brock in the stomach and abdomen. After Mr. Brock stopped struggling and the assailants believed he was dying they took his credit card and cellphone, ran to and out of the basement of the home, jumped a fence and ran to an alleyway where Thomas said [Appellant] tossed the cellphone and the gloves the latter had been wearing. The men ran to their homes, washed and changed their clothes, threw away their bloody clothes, went to the bank to use Mr. Brock's credit card and then went to eat at A-Plus. Thomas also testified that he had discarded the gloves he had been wearing during the criminal incident and buried a knife he had used. Police found the gloves which contained Mr. Brock's DNA but never located the knife although the broken box cutter and a bent knife had been found at Mr. Brock's home. When Mr. Brock's body had been removed from the body bag in advance of the autopsy the broken blade of a box cutter fell from the bottom of the bag. [Appellant] offered no evidence at trial.[2]

---

[2] Prior to trial the court had suppressed the Commonwealth's use of [Appellant's] confession, items found in a storm drain in the street located by police as a result of information revealed in the confession, and sneakers [Appellant] had been wearing when being interrogated while in police custody. The Commonwealth appealed the court's ruling which was subsequently affirmed by the Superior Court on April 11, 2017. [*Commonwealth v. Lukach*, 163 A.3d 1003 (Pa.Super. 2017)]. The Pennsylvania Supreme Court, which granted the Commonwealth's petition for allowance of appeal, affirmed the Superior Court on October 17, 2018. [*Commonwealth v. Lukach*, 195 A.3d 176 (Pa. 2018)].

Trial Court Opinion, 7/21/19, at 2-6.

Appellant was tried by a jury and convicted of the aforementioned offenses. He was sentenced to life imprisonment for second-degree murder. He filed a timely notice of appeal, and both Appellant and the trial court complied with the mandates of Pa.R.A.P. 1925.

Appellant raises one issue for our review:

> 1. Whether the [t]rial [c]ourt committed reversible error when it permitted Juror No. 9 to remain on the jury, when the juror indicated that she was troubled by the Appellant not following the Court's instruction that he was not to communicate with anyone concerning his case and ignored that instruction by communicating with the juror's husband, who is an employee of the Schuylkill County Prison, where Appellant was being held during trial.

Appellant's brief at 5.

Appellant argues that the trial court erred when it failed to remove Juror Number Nine. "The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." *Commonwealth v. Carter*, 643 A.2d 61, 70 (Pa. 1994). Our Supreme Court has set forth the standard for prospective juror disqualification as follows:

> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor. . . . It must be determined whether any biases or prejudices can be put aside on proper instruction of the court. . . . A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct or answers to questions.

*Commonwealth v. Briggs*, 12 A.3d 291, 333 (Pa. 2011). We employ the same analysis whether a question arises about a juror's impartiality before or during trial. *Commonwealth v. Pander*, 100 A.3d 626, 632 (Pa.Super. 2014) (*en banc*). Also, we note that "a finding regarding a venireman's impartiality 'is based upon determinations of demeanor and credibility that are

- 4 -

peculiarly within a trial [court]'s province. . . [Its] predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record.'" **Commonwealth v. Smith**, 540 A.2d 246, 256 (Pa. 1988) (quoting **Wainwright v. Witt**, 469 U.S. 412, 428-29 (1985)).

Jury selection was held on March 4, 2019. The following day, the trial court was notified by court administration of an issue regarding Juror Number Nine. N.T. Jury Trial, 3/5/19, at 4. A county prison employee contacted the deputy court administrator to inform him that Appellant had yelled out to him that he knew that the employee's wife, Juror Number Nine, had been selected for his jury. **Id**. at 4-5. Juror Number Nine also separately informed the trial court of the contact Appellant had initiated with her husband. **Id**. at 6.

Counsel and the trial court extensively questioned Juror Number Nine about the interaction and any concerns that may have arisen from it, which may have affected her ability to be an impartial juror. **Id**. at 7-20. Juror Number Nine stated that the conduct raised questions as to whether Appellant was trying to communicate with her indirectly. Also, she expressed uncertainty whether Appellant had disregarded a court instruction not to contact spouses of jurors, or if the interaction was a result of a simple lack of understanding on Appellant's part. During a break in the questioning, defense counsel requested that the juror be dismissed from the jury. **Id**. at 14.

The Commonwealth objected and Juror Number Nine was brought back into the courtroom for further questioning. Juror Number Nine stated that she could "put aside" the fact that Appellant had contacted her husband and still be "fair and objective." *Id*. at 19. She assured the court that she would not engage in any discussion with her husband about this case or inform other jurors about what had happened. At the conclusion of her testimony, the trial court denied defense counsel's request to dismiss the juror. *Id*. at 20.

On appeal, Appellant argues that the trial court erred when it did not remove Juror Number Nine, because she "expressed bias and prejudice against the Appellant." Appellant's brief at 11. The trial court found that "absolutely nothing about [Juror Number Nine's] demeanor or responses indicated that she would not serve impartially or properly fulfill her sworn duty as a juror." Trial Court Opinion, 6/21/19, at 6. Further, it "firmly believed and continues to believe, based upon the words expressed, tone of voice, facial expressions and overall demeanor exhibited during the examination of this forthright woman, that no cause existed to find she would not follow her oath and be fair and impartial." *Id*. at 7-8. We have no basis to disturb that finding.

Appellant has not met his burden to show that Juror Number Nine was biased. *Commonwealth v. Noel*, 104 A.3d 1156, 1169 (Pa. 2014) (finding that it is the appellant's burden to show that the jury was not impartial). The trial court engaged in a detailed colloquy of Juror Number Nine, and found

that she could be impartial.  Appellant has offered nothing more than his unsupported opinion that this finding was incorrect.  We do not lightly reconsider the trial court's decision.  Since the juror stated that she could remain fair and impartial and was questioned by trial counsel and the court, we conclude that the trial court properly exercised its discretion in denying Appellant's request to remove.  Accordingly, relief is denied.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/25/2019