# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-3339

_____

United States of America

*Plaintiff - Appellee*

v.

Neiman Regis Adams

*Defendant - Appellant*

_____

No. 14-3354

_____

United States of America

*Plaintiff - Appellee*

v.

Neiman Regis Adams

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 23, 2015
Filed: April 11, 2016

_____

Before WOLLMAN, BYE, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Neiman Regis Adams was convicted of armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d), and was sentenced to 240 months' imprisonment. He was also sentenced to a consecutive term of 18 months' imprisonment for violating the terms of supervised released that was imposed following an earlier conviction. He appeals from the district court's[1] denial of his motion to suppress statements that he made during a custodial interrogation, as well as from the sentences imposed by the district court, arguing that they are substantively unreasonable. We affirm.

I.

On August 13, 2013, two black men entered the Virginia Cooperative Credit Union (the bank) located in Virginia, Minnesota, and committed an armed robbery. At that time, three tellers and one customer were in the bank. Neither of the men who entered the bank wore a mask. One of the men was armed with a handgun and wore a flat-brimmed baseball cap, a dark, hooded sweatshirt with the hood up, and a lanyard around his neck. That individual pointed his gun at the tellers and the customer, ordering them to lie on the ground, while the other individual walked behind the counters and emptied the tellers' cash drawers. The robbery lasted approximately two minutes, and the men stole approximately $53,000. The local police department, with assistance from the Federal Bureau of Investigation (FBI), investigated the robbery. The police were unable to identify the robbers from any

_____

[1]The Honorable Richard H. Kyle, United States District Court for the District of Minnesota, adopting the report and recommendations of the Honorable Leo I. Brisbois, United States Magistrate Judge for the District of Minnesota.

physical evidence left at the scene of the crime, but the robbery was captured on the bank's security cameras from multiple angles. Following a three-day investigation, police arrested Adams on August 16, 2014. That day, police detective Bruce L. Hedstrom met with Adams. After being informed of his Miranda rights, Adams stated that he did not want to answer questions, and Hedstrom terminated the interrogation.

On August 30, 2013, Hedstrom brought FBI special agent Timothy Ball to the jail, where Ball interviewed Adams. Ball first advised Adams of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), reading aloud an FBI "Advice of Rights" form. After stating each right, Ball asked Adams whether he understood, and Adams indicated that he did. Ball asked Adams to sign his name at the bottom of the form, indicating that he understood his rights, but Adams refused to do so, stating that he did not understand why he was being questioned and that he did not like "dealing with cops." Ball informed Adams that he could refuse to answer questions, could choose to answer some questions but not answer others, and could terminate the interview at any time. Approximately three minutes and forty seconds into the interview, Ball asked Adams if he wanted to answer questions. The two then had the following exchange:

> ADAMS: No, I don't think I wanna, you know--
> BALL: I'll explain what's going on. We've got you in the . . . bank. We've talked to a lot of people and collected a lot of information. And that's why you're here, for robbing the bank.

Approximately six minutes into the interview, Adams stated:

> ADAMS: I was at my girlfriend's Rebecca's--
> BALL: Okay, so you were--

ADAMS: Nah, I don't want to talk, man.  I mean, I–[2]
BALL: Okay, so you were saying you were at your girlfriend Rebecca's house.--
ADAMS: I mean--
BALL:  That's where the problem is, okay, because we know you weren't at your girlfriend Rebecca's house.--
ADAMS:  I just, I just, I just wanna, you know what I'm saying?--
BALL: Okay, okay, that's fine, but just so you know, your alibi of being at Rebecca's house all day, every second--
ADAMS:  No, I wasn't there all . . . I wasn't there all day.
BALL:  Okay.

The interview continued for approximately sixteen additional minutes, during which time Adams made statements that he was innocent, that he was not a "rat," and that he had sold his white Dodge Durango SUV before the robbery occurred.

Prior to trial, Adams moved to suppress the statements that he made during the interrogation because they were obtained in violation of Miranda, 384 U.S. 436.  The district court denied the motion, finding that Adams had implicitly waived his Miranda rights when he answered Ball's questions.  It further found that Adams's statement, "I don't want to talk, man," was not an unambiguous invocation of his right to remain silent, because the context suggested that he was expressing his reluctance to talk about certain topics and because he continued to answer questions immediately after he made the statement.  The district court concluded that under the totality of the circumstances, Adams had voluntarily waived his Miranda rights.

---

[2]Both Adams and the district court transcribed this sentence differently.  Adams transcribed the phrase as "Naw.  I mean, I don't want to talk man.  Cuz I mean I don't--."  The district court transcribed it as "I don't want to talk to you."  We have, for the most part, adopted Adams's version, and note that Adams's exact words are unclear from the recording because of poor sound quality.  In any event, the difference has no bearing on the outcome of this appeal.

Most of the government's evidence at trial centered on identifying Adams as the armed individual who robbed the bank. The government introduced the video recordings of the robbery and testimony from two of the bank tellers who had been working during the robbery. The tellers testified that they saw the armed individual's face and that they recognized Adams as that individual. The government also introduced testimony from three of Adams's girlfriends, D.D., C.O., and R.S. D.D., who testified on the condition that she receive immunity from prosecution, stated that she knew that Adams was the individual in the video based on her familiarity with Adams and "[t]he way his hands were, the way he was standing, vaguely the face, his structure, everything." C.O., who worked for the police as a confidential informant, testified that she had identified Adams as the individual in the video for the police during the investigation. On cross-examination, she testified that her confidence that Adams was the man in the video was "50-50."

The government also introduced evidence of Adams's conduct before and after the robbery. D.D. and R.S. both testified that soon after the robbery, Adams asked them to store large sums of money for him, and that following his arrest he instructed them to deliver the money to various individuals. R.S. further testified that Adams was with her on the day of the robbery but left her apartment at approximately noon and returned at approximately 2:00 p.m., and that one week before the robbery occurred Adams had shown her a gun matching the description of the gun used in the robbery. D.D. further testified that Adams frequently wore a flat-brimmed baseball cap and a lanyard around his neck, and that the day before the robbery Adams made statements and sent text messages to her, including that he was "going to do something stupid," that "this is the last day you'll see me," and that "I got to get ready for tomorrow." The government also introduced audio recordings of Adams's prison phone calls, during one of which Adams instructed a friend to remove money hidden in R.S.'s house, stating, "They ain't got nothing, I don't want them to get nothing." Additional testimony addressed Adams's white Dodge Durango SUV. A witness stated that he had observed two black men in a vehicle matching the description of

Adams's Durango, and that the vehicle was parked in a parking lot near the bank shortly before the time of the robbery.

Detective Hedstrom was the only witness who discussed the statements that Adams made during his interrogation. Hedstrom testified that during the August 30 interrogation, Adams "said he was at his girlfriend['s apartment], and [that] when [told] that his vehicle was seen approximately a block away from the credit union, [said] that he had sold that truck." The government discussed those statements in its opening and closing arguments, noting that they were lies and could be interpreted as evidence of Adams's guilt.

Adams's presentence investigation report (PSR) calculated a base offense level of 29 and a criminal history category of IV. Based on Adams's two prior convictions for violent felonies, however, the PSR applied the career-offender enhancement under § 4B1.1 of the U.S. Sentencing Guidelines Manual (U.S.S.G. or Guidelines), resulting in a total offense level of 34, a criminal history category of VI, and a recommended sentencing range of 262 to 300 months' imprisonment. The district court adopted the findings in the PSR, varied downward, and, as set forth above, sentenced Adams to 240 months' imprisonment.

Adams previously had been convicted of bank robbery with a dangerous weapon and was serving a term of supervised release when he committed the instant offense. Because his conviction for bank robbery constituted a violation of the terms of his supervised release, the district court also conducted a revocation hearing during sentencing. The Guidelines recommended a sentencing range of 18 to 24 months. Adams requested a within-Guidelines sentence and that his revocation sentence be concurrent with his 240-month sentence for the instant offense. The district court sentenced Adams to 18 months' imprisonment, to be served consecutive to his other sentence.

II.

Adams first claims that the district court's denial of his motion to suppress his statements from the August 30, 2013, interrogation violated his Fifth Amendment rights. "We review *de novo* the legal conclusions underlying the denial of a motion to suppress on Fifth Amendment grounds, while the factual findings are reviewed for clear error." United States v. Thomas, 664 F.3d 217, 221 (8th Cir. 2011) (quoting United States v. Wise, 588 F.3d 531, 536 (8th Cir. 2009)).

A.

Adams argues that the district court clearly erred when it found that Adams's statement, "I don't want to talk, man," was not an unequivocal invocation of his right to remain silent. During an interrogation, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74. "To adequately invoke this right and effectively cut off questioning, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.'" United States v. Johnson, 56 F.3d 947, 955 (8th Cir. 1995) (quoting United States v. Thompson, 866 F.2d 268, 272 (8th Cir. 1989)). "We consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent." Id. After Adams said "Nah, I don't want to talk, man. I mean, I," he immediately proceeded to engage in an exchange with Ball. The phrase "I mean" signaled that Adams intended to clarify the statement, "I don't want to talk, man," and the statement was therefore ambiguous. See United States v. Havlik, 710 F.3d 818, 822 (8th Cir. 2013) (holding that the statement "I guess you better get me a lawyer then" was not an unequivocal invocation of the right to an attorney because the phrase "I guess" was equivocal). Adams thereafter continued to talk with Ball for an additional sixteen minutes, never clarifying his earlier statement or otherwise unequivocally invoking his right to remain silent. In light of these circumstances, the district court did not

commit clear error in finding that Adams had not indicated a clear, consistent expression of a desire to remain silent.

Adams argues that the district court also clearly erred in finding that he impliedly waived his Miranda rights when he answered Ball's questions. He claims that the circumstances surrounding his interrogation demonstrate that he did not intend to waive his right to remain silent. Those circumstances include his refusal to sign the FBI's form, his statement that he did not like talking with law enforcement, and his assertion of his right to remain silent during the August 16 interview. We disagree. Waiver of the right to remain silent "can be clearly inferred from the actions and words of the person interrogated." North Carolina v. Butler, 441 U.S. 369, 373 (1979). "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Berghuis v. Thompkins, 560 U.S. 370, 384 (2010). Adams does not dispute that he was informed of his rights or that he understood them. When Adams made uncoerced statements to Ball, he engaged in a course of conduct indicating waiver. The circumstances to which he cites do not overcome the fact that he understood his Miranda rights and nevertheless chose to speak to Ball. See id. at 386 ("The fact that Thompkins made a statement about three hours after receiving a Miranda warning does not overcome the fact that he engaged in a course of conduct indicating waiver."). The district court therefore did not err in concluding that Adams had waived his Miranda rights.

Adams argues in the alternative that, even if he waived his right to remain silent, that waiver was involuntary in light of his poor academic performance in high school (he graduated with a 2.44 cumulative grade point average (GPA)) and in community college (a GPA of 1.40 from eighteen credits) and because Ball continued to ask questions after Adams stated, "I don't want to talk, man." "We consider the totality of the circumstances, including the conduct of the officers and the characteristics of the accused, in determining whether a suspect's waiver or

statements were the product of an overborne will." Havlik, 710 F.3d at 822. Although Adams's mental acuity is relevant in determining whether his statements were voluntary, it is not dispositive. See Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001) (concluding that a confession was involuntary because it was obtained from a mentally handicapped suspect after more than four hours of questioning, during which time the police asked leading questions and made intimidating, threatening statements to the suspect). Here, the officers used no coercive tactics, Adams knew his rights, and he was familiar with police interrogations, having successfully invoked his right to remain silent two weeks earlier. In light of these circumstances, we agree with the district court's finding that his waiver was voluntary.

B.

In any event, any error in denying the motion to suppress would have been harmless. "An error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.'" United States v. Looking Cloud, 419 F.3d 781, 787 (8th Cir. 2005) (quoting United States v. Crenshaw, 359 F.3d 977, 1003-04 (8th Cir. 2004)). "The admission of statements obtained in violation of Miranda may constitute harmless error [when] there remains overwhelming independent evidence as to the defendant's guilt." Chavez v. Weber, 497 F.3d 796, 805 (8th Cir. 2007) (quoting United States v. Packer, 730 F.2d 1151, 1157 (8th Cir. 1984)).

As recounted above, the government presented substantial evidence to identify Adams as the individual who robbed the bank. It introduced the video recordings of the robbery, from which the jury could tell that Adams was the same size and build as the individual in the video. Two bank tellers identified Adams as the individual who had pointed a gun at them, and two of Adams's girlfriends identified him as the

individual in the video recording of the robbery. There was evidence that Adams's vehicle was located near the bank shortly before the robbery, as well as testimony that shortly after the robbery Adams hid large sums of money in his girlfriends' houses. And there were Adams's own incriminating statements, presented through text messages and recordings of phone calls he made from prison. By contrast, evidence from Adams's interrogation consisted of only one sentence in Hedstrom's testimony, and the government mentioned the interrogation only briefly during opening and closing statements. Adams's statements thus were not the focus of the trial, and any influence they might have had on the jury was slight in comparison to the evidence that identified Adams as one of the bank robbers.

Adams argues that those statements were highly prejudicial because they directly contradicted his theory of the case, which was that he was aware of the crime and helped hide the money, but did not directly participate in the robbery. Again, whatever impact his statements may have had on the jury's assessment of Adams's mere-tangential-involvement defense pales in comparison to the overwhelming evidence that he had participated in the robbery.

III.

Adams next challenges his sentences as substantively unreasonable. "We will not reverse a sentence as substantively unreasonable absent a showing of abuse of discretion by the district court." United States v. San-Miguel, 634 F.3d 471, 475 (8th Cir. 2011) (citing Gall v. United States, 552 U.S. 38, 51 (2007)). "A district court abuses its discretion when it fails to consider a relevant [sentencing] factor, gives significant weight to an irrelevant or improper factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case." Id. (quoting United States v. Jones, 509 F.3d 911, 913 (8th Cir. 2007)). Given the district court's discretion in imposing sentence, "it will be the unusual case when we

reverse a district court sentence . . . as substantively unreasonable." United States v. Feemster, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) (quoting United States v. Gardellini, 545 F.3d 1089, 1090 (D.C. Cir. 2008)).

Adams argues that his 240-month sentence is substantively unreasonable because the district court did not give sufficient weight to mitigating factors and because the sentence is greater than necessary to accomplish the goals of sentencing. In particular, Adams points to his difficult upbringing—his father was an abusive alcoholic, his mother was a drug addict, and he was eventually placed in the foster-care system. Additionally, he recounts his substance abuse history; his mental-health treatment; and his previous attempts, though unsuccessful, to turn his life around. "Simply because the district court weighed relevant factors . . . more heavily than [Adams] would prefer does not mean the district court abused its discretion." United States v. Farmer, 647 F.3d 1175, 1179 (8th Cir. 2011). The record makes clear that the district court was aware of the relevant facts and that it considered them in imposing sentence. Although the district court placed more weight on some factors and placed less weight on other factors than Adams thinks it should have, we conclude that the district court did not abuse its discretion in doing so.

We have considered and find to be without merit Adams's argument that his consecutive 18-month revocation sentence is substantively unreasonable because the district court did not identify which sentencing factors it considered in imposing the sentence and did not take into account those previously listed mitigating factors.

The judgment is affirmed.

_____