J-S16043-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN NESBIT | : | No. 170 EDA 2021 |

Appeal from the Order Entered November 25, 2020
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-CR-0002557-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN NESBIT | : | No. 171 EDA 2021 |

Appeal from the Order Entered November 25, 2020
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-CR-0000910-2019

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED AUGUST 23, 2021**

The Commonwealth brings this interlocutory appeal[1] from the order

entered in the Court of Common Pleas of Monroe County denying its motion

_____

[*] Former Justice specially assigned to the Superior Court.

[1] This Court has jurisdiction over the present appeal filed by the
Commonwealth of Pennsylvania pursuant to Pennsylvania Rule of Appellate
*(Footnote Continued Next Page)*

to dismiss Defendant/Appellee Jonathan Nesbit's Omnibus Pretrial Motion as untimely filed, granting Nesbit's motion to extend the time for filing his Omnibus Pretrial Motion *nunc pro tunc*, and granting Nesbit's motion to suppress statements he made during his custodial interrogation as the involuntary product of **Miranda**[2] violations.

Herein, the Commonwealth contends that the court's order accepting Nesbit's untimely motion for merits review contravened our Rules of Criminal Procedure and interpretive decisional law, as Nesbit demonstrated neither cause for the significantly late filing of his Omnibus Motion nor that justice required the court to accept the untimely motion. After careful review, we reverse and remand.

The present case arises from the Pocono Mountain Regional Police Department's investigation into the April 2, 2019 overdose-related death of 26 year-old Jaidee Ortiz. Police learned through witness statements and examination of Ortiz's text messages that one Ronald Aherns had delivered heroin to Ortiz earlier that day.

Using Ortiz's phone, Corporal Lucas Bray posed as Ortiz and arranged another heroin purchase with Aherns. When Aherns arrived, police arrested

---

Procedure 311(D), as the Commonwealth has asserted in its Notice of appeal that the Order below will terminate or substantially handicap the prosecution of this matter. **See Commonwealth v. Liddie**, 21 A.3d 229, 232 n.2 (Pa. Super. 2011).

[2] **Miranda v. Arizona**, 384 U.S. 436, 86 S. Ct. 1602 (1966).

him. Aherns subsequently provided a statement to police implicating the 27 year-old Nesbit as his supplier.

Now posing as Aherns while using Aherns' cell phone, Corporal Bray arranged with Nesbit to purchase four heroin bags of approximately one gram from him, with delivery to be made at Aherns' home. When Nesbit arrived as arranged, he was arrested with four bags of heroin, which later tested positive for fentanyl, in his possession.

Corporal Bray and Corporal Matthew Nero brought Nesbit to an interview room at the Pocono Mountain Regional Police Department, where Nesbit eventually provided an uncounseled statement of his involvement with the delivery of heroin/fentanyl to both Ahrens (who delivered to Ortiz) and Corporal Bray (posing as Ahrens).

On April 4, 2019, a criminal complaint was filed against Nesbit at 910 CR 2019. In that docket, Nesbit was charged with Possession with Intent to Deliver, to wit: heroin and/or fentanyl, 35 Pa.C.S. § 780-113(a)(30), ("PWID"); Criminal Use of Communication Facility, 18 Pa.C.S.A. §7512(a); Intentional Possession of Controlled Substance by Person not Registered, 35 Pa.C.S. § 780-113(a)(16); and Possession of Drug Paraphernalia, 35 Pa.C.S. § 780-113(a)(32. These charges stem from a drug transaction occurring on April 3, 2019, in Tunkhannock Township, Monroe County, Pennsylvania.

On June 13, 2019, a criminal complaint was filed against Nesbit at 2557 CR 2019. In that docket number, Nesbit was charged with Drug

Delivery Resulting in Death, 18 Pa.C.S.A. § 2506(a), Manufacture, Deliver or Possession with Intent to Deliver, to wit: heroin, 35 Pa.C.S. § 780-113(a)(30); Criminal Conspiracy – Engaging in Manufacture, Delivery or Possession with Intent to Deliver, 18 Pa.C.S.A. § 903(a)(1); Criminal Use of Communication Facility, 18 Pa.C.S.A § 7512(a); and Intentional Possession of Controlled Substance by Person not Registered, 35 Pa.C.S.A § 780-113(a)(16). These charges stem from an alleged drug delivery which resulted in the death of Jai Dee Ortiz on April 2, 2019. The delay in filing of these charges resulted from the need to obtain forensic toxicology reports necessary for the charge of Drug Delivery Resulting in Death.

From April through November of 2019, six different counsel entered their appearances and represented Nesbit in both cases.[3] The sixth counsel was appointed conflict counsel and represented Nesbit during the November

_____

[3] The record indicates Nesbit was represented initially by privately retained counsel, who eventually filed a petition to withdraw which the court granted on May 29, 2019. Nesbit made an application to the Public Defender's Office for representation, but on July 16, 2019, the Defender's filed a Motion to Appoint Conflict Counsel since that office represented Mr. Ahrens. On July 17, 2019, conflict counsel was appointed, but he became aware of a conflict and in late October requested new conflict counsel be appointed in both cases. On November 4, 2019, second conflict counsel was appointed in both cases, however, upon his discovery of a conflict, the court appointed a third conflict counsel on November 14, 2019. On November 26, 2019, for reasons not developed in the record, the appointment of a fourth conflict counsel was necessary. As noted, *infra*, fourth conflict counsel represented Nesbit at both the hearing in which Nesbit's cases were joined and at Nesbit's arraignment of November 27, 2019, and he filed Nesbit's untimely Omnibus Pretrial Motion on February 4, 2020.

26, 2019 proceeding at which joinder of the two cases against him occurred and at Nesbit's November 27, 2019 arraignment.

On February 4, 2020, 69 days after Nesbit's arraignment, the same counsel filed an Omnibus Pretrial Motion seeking suppression of Nesbit's statements provided during his custodial interrogation. On March 11, 2020, the Commonwealth filed a Motion to Dismiss the Omnibus Motion as untimely under the Rules of Criminal Procedure which require such motions to be filed no later than 30 days after arraignment. **See** Rule 579(A), *infra*.

On May 1, 2020, Nesbit retained private counsel, who, on June 8, 2020, filed, *inter alia*, a Motion *Nunc Pro Tunc* requesting an extension of time for the late filing of the Omnibus Motion. After conducting a June 9, 2020 hearing on the motion, the court entered its November 25, 2020 Opinion and Order granting Nesbit's requested relief, in part,[4] and suppressing Nesbit's statements made during his custodial interrogation. Pursuant to Pa.R.A.P. 311(D), the Commonwealth filed a timely appeal of the court's Order, certifying that the court's decision terminated and/or substantially handicapped the prosecution of Nesbit in both cases.

The Commonwealth presents for this Court's consideration the following issues:

1. Whether the lower court abused its discretion in denying the Commonwealth's Motion to Dismiss [Nesbit's] Omnibus Motion and thereby granting [Nesbit's] Motion to Extend Time for filing Omnibus *Nunc Pro Tunc* for cause shown, when [Nesbit's]

---

[4] The court denied Nesbit's motion for *habeas* relief, which sought dismissal of all charges.

Omnibus Motion was beyond the omnibus deadline in Pa.R.Crim.P. 579 and 581 and [Nesbit] failed to demonstrate cause for said late filing?

2. Whether the lower court erred in granting Nesbit's Motion to Suppress on the basis that Nesbit unequivocally invoked his right to counsel and any continued questioning violated his constitutional rights?

Commonwealth's Brief, at 8.

When the Commonwealth appeals from the grant of a suppression order, we adhere to the following standard of review:

[We] consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

**Commonwealth v. Korn**, 139 A.3d 249, 253-54 (Pa. Super. 2016) (citation omitted). We review the suppression court's legal conclusions *de novo*. **Id**. "[A]ppellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress." **Commonwealth v. Harlan**, 208 A.3d 497, 499 (Pa. Super. 2019) (citation omitted).

Raised first is the issue asking whether the trial court properly applied Pa.R.Crim.P. 579 and 581[5] in accepting Nesbit's untimely suppression motion

---

[5] Rule 579. Time for Omnibus Pretrial Motion and Service, provides, in relevant part:

*(Footnote Continued Next Page)*

for "cause shown" or 'in the interests of justice." Specifically, the trial court determined the exceptions to Rule 579's 30-day time-bar applied because five pretrial counsel had sought and were granted withdrawal for reasons of conflict during the seven months leading up to the joinder of Nesbit's two docketed cases on November 26, 2019 and his arraignment on the second case on November 27, 2019, when Nesbit was newly represented by his sixth counsel.

The Commonwealth maintains the court misconstrued the procedural rules to find that cause was shown or the interests of justice were implicated

---

A. Except as otherwise provided in these rules, the omnibus pretrial motion for relief shall be filed and served within 30 days after arraignment, unless opportunity therefor did not exist, or the defendant or defense attorney, or the attorney for the Commonwealth, was not aware of the grounds for the motion, or unless the time for filing has been extended by the court for cause shown.

. . . .

Pa.R.Crim.P. 579(A).

Rule 581. Suppression of Evidence, provides in relevant part:

A. The defendant's attorney, or the defendant if unrepresented, may make a motion to the court to suppress any evidence alleged to have been obtained in violation of the defendant's rights.

B. **Unless the opportunity did not previously exist, or the interests of justice otherwise require**, such motion shall be made only after a case has been returned to court and shall be contained in the omnibus pretrial motion set forth in Rule 578. If timely motion is not made hereunder, the issue of suppression of such evidence shall be deemed to be waived.

Pa.R.Crim.P. 581(A), (B).

in the present case simply because multiple attorneys represented Nesbit during the period leading up to his November 27, 2019 arraignment. It emphasizes there were lengthy periods where one counsel represented Nesbit, the most important of these taking place from the November 27, 2019 arraignment through May 1, 2020, during which sixth counsel had the opportunity to file a timely Omnibus Motion, or a motion seeking an extension of time to do, by December 27, 2019, but he never did. In this respect, the Commonwealth observes that the court gave no other reason for its decision to excuse Nesbit's significantly late filing other than the number of counsel changes that had preceded the filing of his Omnibus Motion.

A review of the trial court's Opinion of November 25, 2020, denying the Commonwealth's Motion to Dismiss Nesbit's untimely Omnibus Motion shows that it relied expressly on the frequent changes in representation to forgive Nesbit's untimely Omnibus Motion:

> The Commonwealth has asked this [trial court] to dismiss Nesbit's Motion as being untimely. Pa.R.Crim.P. 579(A) states that the "omnibus pretrial motion for relief shall be filed and served within 30 days after arraignment, unless . . . the defendant or defense attorney, or the attorney for the Commonwealth, was not aware of the grounds for the motion, or . . . the time for filing has been extended by the court for cause shown."
>
> The Commonwealth argues that Nesbit has waived his suppression issue and his request to sever the cases for trial because of his untimely Motion[fn] In response to the Commonwealth's Motion to Dismiss, Nesbit argues that there have been six (6) attorneys representing him over a fifteen (15) month period.[fn] Several of the other appointed attorneys have been relieved of representing Nesbit due to various conflicts.

[fn] Nesbit's Formal Arraignment was held on November 27, 2019; accordingly, any Omnibus Pretrial Motions were due on December 27, 2019.

[fn] [The trial court lists each counsel who has represented Nesbit and his or her respective term of representation. Notably, conflict counsel appointed on November 26, 2019 represented Nesbit at his November 27, 2019 arraignment and filed the untimely Omnibus Pretrial Motion on February 4, 2020, 39 days after the December 27, 2019 30-day deadline had expired.] On May 1, 2020, current counsel entered his appearance for Nesbit in both cases and on June 8, 2020, counsel filed a Motion to Extend the Time for Filing Omnibus *Nunc Pro Tunc*[, which was substantively identical to the February 4, 2020 Omnibus Motion but simply clarified that the prior motion failed to indicate it sought *nunc pro tunc* relief.

---

On November 26, 2019, Nesbit's previous attorney Bradley Weidenbaum was appointed as conflict counsel and on February 4, 2020, he filed the Motion which is currently before the [trial court]. Additionally, Nesbit's [defense counsel at the time of the trial court's opinion] filed a Motion to Extend Time for Filing Omnibus *Nunc Pro Tunc* on June 8, 2020.

Pursuant to Pa.R.Crim.P. 581, in the interest of justice, [the trial court] may permit Nesbit to file a motion to suppress any evidence alleged to have been obtained in violation of his rights. After review of the docket entries, which indicate that several conflict counsel were appointed to represent Nesbit, we believe these appointments resulted in some delay in having the pre-trial motion timely filed in this matter. Since a Motion to Extend Time for filing of the Motion to Extend Time for Filing Omnibus *Nunc Pro Tunc* was filed on June 8, 2020, we believe the late filing of the Motion should be permitted. Thus in the interests of justice and in fairness to Nesbit, we will deny the Commonwealth's Motion to Dismiss.

TCO, 11/25/20, at 2-3.

For his part, Nesbit posits that Rule 581(B) is written in a flexible fashion to permit a trial court to consider an untimely suppression motion "in the interests of justice[,]" or when the opportunity to file the motion did not previously exist. Appellee's brief, at 10., *citing* **Commonwealth v. Johnson**, 844 A.2d 556, 561 (Pa. Super. 2004); **Commonwealth v. Baez**, 21 A.3d 1280, 1282 (Pa. Super. 2011) (holding "cause shown" to support trial court acceptance of *nunc pro tunc* suppression motion consisted of belated receipt of supplemental discovery report warranting suppression motion).

On his claimed lack of opportunity to file a timely motion as forming the basis for Rule 518(B) relief, Nesbit maintains "[t]he procedural confusion caused by the revolving door of attorneys and the four separate conflicts therein were outside of [his] control, and his attorneys acted as expediently as possible given the circumstances of the case. . . . [T]he trial court, in its sound discretion, ruled [this history] affected the timeliness of the motion." Appellee's brief, at 11.

Nesbit also cites decisional law recognizing that the interests of justice exception in Rule 581(B) is implicated where "the merits of counsel's [untimely] motion [are] so apparent that justice require[s] that it be heard." **Commonwealth v. Williams**, 323 A.2d 862 (Pa. Super. 1974). **See also Commonwealth v. Hubbard**, 372 A.2d 687, 693 (Pa. 1977) (discussing Williams), *overruled on different grounds*, **Commonwealth v. Grant**, 813 A.2d 726, 738 (Pa. 2002). The trial court, however, did not allude to the merits of Nesbit's motion to suppress in that part of its November 25,

- 10 -

2020, opinion invoking Rule 581 to deny the Commonwealth's Motion to Dismiss.

Nor, for that matter, does Nesbit develop the argument that the merits of his motion to suppress were so apparent that justice demanded review of the untimely motion. Nevertheless, we may infer from a separate section of the court's opinion granting Nesbit's Motion to Suppress statements obtained during the custodial interrogation that the court implicitly found the merits of his motion to suppress satisfied the **Williams** test.

As noted *supra*, our Rules of Procedure require a defendant to file and serve an omnibus motion no later than 30 days after the date of his arraignment, unless the opportunity to do so did not exist, or the defense attorney or the Commonwealth was not aware of the grounds for the motion, or the court extends the time of filing for cause shown. Pa.R.Crim.P. 579(A). In the instant matter, the trial court decided to address the merits of Nesbit's untimely Omnibus Motion/Motion to Suppress pursuant to Rule 579's exception for cause shown, which, the court determined, was demonstrated either by Nesbit's lack of opportunity to file a timely Omnibus Motion because of the many withdrawals of counsel during the pretrial period, or by Nesbit's motion to suppress, the merits of which, the court found, were "so apparent" that justice demands it be accepted by the court despite its gross untimeliness.

We take judicial notice of the seven months leading to the November 26, 2019 joinder of Nesbit's cases and his November 27, 2019 arraignment

and observe that the period is indeed marked by frequent withdrawals of counsel primarily for reasons of conflict. Nevertheless, there is no dispute that counsel who represented Nesbit at his November arraignment remained counsel through the 30-day period leading to the December 27, 2019 filing deadline for an Omnibus Motion, and during this period he filed neither the motion nor a request for an extension of time to file such motion.

Instead, he waited an additional 39 days before filing an untimely Omnibus Motion 69 days after the arraignment, and he did so without providing a reason for the great delay. Nor did subsequent counsel explain in the May 2020 *Nunc Pro Tunc* Motion to Extend Time for Filing why there existed no opportunity to file a timely Omnibus Motion seeking suppression of statements Nesbit provided at his April 3, 2019 custodial interrogation.

Therefore, the record confirms there were no changes of counsel during the relevant time between Nesbit's November 27 arraignment and the December 27 Omnibus Motion deadline, nor is there any indication that necessary records or transcripts pertinent to the preparation of the component motion to suppress were unavailable to counsel. In this respect, the present case is distinguishable from **Baez** and **Johnson**, *supra*, upon which Nesbit relies.

Accordingly, we disagree with the trial court's assessment that previous counsel changes in the seven months prior to this relevant timeline caused

the filings of a significantly untimely Omnibus Motion and Motion to Extend time for Filing.

The trial court's second basis for reviewing the untimely motion was its conclusion that the suppression motion's underlying merits were "so apparent" that justice required merits review despite our Rules' general restriction of review to timely motions.

In *Williams*, *supra*, we addressed the "interests of justice" standard governing a court's inquiry into whether it may review the merits of an untimely filed motion to suppress. *Williams* involved a defendant who had been charged with driving under the influence of alcohol. At trial, the investigating officer testified that police responded to a report of an automobile accident and found an injured defendant slumped behind the wheel and smelling strongly of alcohol. As he was transported to the hospital, an empty bottle of whiskey was discovered in the back seat of his car.

The officer testified that he later encountered the defendant in a hospital cubicle while a physician was stitching defendant's lip. According to the officer, the defendant still smelled strongly of alcohol, was in a stupor, and his speech was slurred and often incoherent, although the officer understood defendant to claim he had been a decorated boxer in the past who "knocked out Marciano" and would do the same to the officer. *Id*. at 863.

The officer left the cubicle to address the treating physician outside the presence of the defendant and ask him to take a sample of the defendant's

blood for DUI testing. The physician obtained the sample and turned it over to the officer, who sent it for testing. *Id*.

At trial, when the prosecution attempted to admit evidence of the blood test results, defense counsel, for the first time, moved to suppress the evidence. The trial court refused to hear the motion.

On appeal, this Court reversed, holding that where counsel could not reasonably have been expected to have discovered the existence of evidence prior to its introduction at trial, the opportunity to file a pre-trial written motion could not be said to have previously existed. The defendant was hurt at the time and did not remember his conversation with the officer, his medical chart did not indicate a blood sample was taken, and no discovery of the blood sample was provided. *Id*. at 864.

We further held that the interests of justice also independently required the suppression motion to be heard, as the merits of the motion were apparent. In this regard, we noted several reasons supporting this determination. First, the officer testified the defendant was not arrested until 13 days after the hospital blood draw, which would negate the Commonwealth's theory that the blood draw was a lawful search incident under governing law in effect at the time. Consequently, we observed that a

Pennsylvania Supreme Court decision[6] in force at the time, holding that DUI blood test results taken from a hospital patient while he was undergoing treatment for injuries were unlawfully acquired and subject to suppression, controlled. *Id*. at 865.

Even if the officers had declared defendant under arrest in the hospital prior to the blood draw, the law at the time allowed arrests for misdemeanor traffic accidents only when the accident occurred in the officer's presence, which did not happen in **Williams**. Therefore, the arrest could have been deemed invalid on that basis.

Additionally, **Williams** noted that the then-recently enacted Implied Consent Law allowed physicians to give consent for chemical testing where the patient could not physically complete the breath test, but the facts adduced at trial did not appear to indicate that the defendant's lip injury would have prevented him from giving a breath sample.

For these reasons, all of which demonstrated with virtual certainty that defendant's motion would be meritorious if heard, the **Williams** Court concluded that the merits of the oral motion were "so apparent" that the motion should have been accepted at trial. *Id*. at 865-66.

---

[6] ***Commonwealth v. Murray,*** 271 A.2d 500 (Pa. 1970) (suppressing results of a blood test taken from a defendant while he was undergoing treatment for injuries sustained in an automobile accident).

In the present case, after careful review, we find the merits of Nesbit's motion to suppress are not so apparent that justice required the lower court to accept it 39 days beyond the filing deadline. As reproduced below, the notes of testimony from Nesbit's interrogation show he immediately moderated his stated preference for an attorney by voluntarily interjecting—in response to the corporal's neutral statement in compliance with **Miranda**[7] that no further questions would be asked—what

---

[7] It is well settled that when an individual is "both taken into custody and subjected to interrogation," that individual is entitled to **Miranda** warnings. **Commonwealth v. Yandamuri**, 159 A.3d 503, 520 (Pa. 2017). Specifically, our Supreme Court has explained:

> The United States Supreme Court has held that, before law enforcement officers question an individual who has been in taken into custody or has been deprived of his freedom in any significant way, the officers must first warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed. However, these special procedural safeguards are required only where a suspect is both taken into custody and subjected to interrogation. In determining whether a suspect is in custody, two discrete inquiries are essential: (1) an examination of the circumstances surrounding the interrogation; and (2) a determination of whether, given those circumstances, would a reasonable person have felt that he or she was at liberty to terminate the interrogation and leave. As noted, a person is in custody for *Miranda* purposes only when he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. ... Whether an encounter is deemed "custodial" must be determined by examining the totality of the circumstances.

**Id**. at 520-21 (citations omitted).

could reasonably be construed as the beginning of an apparent suggestion as to how questioning could continue. Nesbit confirmed later in the interrogation that such was his intention, as he simply wished to retain control over which questions he would answer if an attorney were not present. ***See*** *infra*.

Notes of testimony from Nesbit's taped interview begin with Corporal Bray stating ***Miranda*** warnings had been given at the time of arrest and were being given again at the interrogation. N.T. 4/3/19, at 5-6. The following exchange then took place:

> **CORPORAL BRAY:** I want to ask you questions. And so these rights are provided to you. When you're in custody, we need to give them to you. So, you're under arrest, and that's why we provided them to you.
>
> **MR. NESBIT:** All right. Um, I swear I'm – I'm not trying to give you a hard time or nothin', but I would prefer to have a lawyer.
>
> **CORPORAL BRAY:** Okay. That's –
>
> **MR. NESBIT:** Yeah.
>
> **CORPORAL BRAY:** -- fine. Just sign right there that I read them [***Miranda*** rights] to you.
>
> **MR. NESBIT:** All right.
>
> **CORPORAL BRAY: And I won't ask you any more questions**.
>
> **MR**. **NESBIT: I mean, we can –**
>
> **CORPORAL BRAY:** I'm not sit -- **so that, again, I want to ask you a whole lot of questions.** And so the second you say you want a lawyer present – I mean, you can change your mind. But when you say that, it kind of trips it. So, um, if you have a lawyer that you wanted me to call this very second, that I could call and he'll come down here, I will wait a little bit and I'll have that conversation with you.

**MR. NESBIT:** I just don't want it -- how you said, it could be used against me in a court of law.

**CORPORAL BRAY:** Oh, yeah –

**MRS. NESBIT:** I don't want – I don't want get [sic] myself –

**CORPORAL BRAY:** Well, you're –

**MR. NESBIT:** --in any more trouble than I'm already in.

N.T. at 5-8 (emphasis added).

Nesbit's asserted "preference" for a lawyer at the outset of the interrogation, standing alone, was fairly unequivocal until he unilaterally and immediately spoke in disregard of the rights to remain silent and to counsel that he had just asserted. Not only did the fact that he voluntarily spoke at all weaken his asserted preference, the suggestion implicit within his uninvited response to the corporal's advisement that questioning would stop was inconsistent with a settled purpose of refusing to participate in the interview.

Specifically, Nesbit's response of, "I mean, we can . . ." at the moment Corporal Bray had just indicated that all questioning stops would signal to any reasonable officer in Corporal Bray's position that Nesbit may not have wished to end the interview altogether and was agreeable to some degree of continued communication. While Nesbit then expressed concern that his words may be used against him, this acknowledgment within the context of the interview as it presently stood did not directly negate his insinuation that questioning need not necessarily stop.

Moreover, not only did Nesbit never indicate during the remainder of the interrogation that he wished to have counsel present, he stated the contrary, that is, that he had simply wished to select which questions he would or would not answer. N.T. at 4/30/19 at 3-4.[8] Police officers are not required

_____

[8] The following excerpt takes place after the corporals realized the batteries to their audio recorder had died and required replacement. Approximately 15 minutes of interview prior to the excerpt below went unrecorded by the audio recorder, although a video recorder continued to record both video and audio of the interview during this time. The court stenographer, however, was unable to discern the audio sufficiently to transcribe the interview during the 15 minute gap.

When the audio recorder resumed function, the following exchange occurred between Corporal Bray and Nesbit in which Nesbit states he had been unsure about the need for a lawyer at the beginning of the interview and wanted to confirm that he could decline to answer any question asked by Corporal Bray:

> **CORPORAL BRAY:** So, Jon, you said before you wanted a lawyer, then you said when we left, you want to talk. For the record, it's up to you, but you tell me. So --
>
> **NESBIT:** I – I just wasn't sure exactly what, uh --
>
> **CORPORAL BRAY:** Okay.
>
> **NESBIT:** --what's the conversation.
>
> **CORPORAL BRAY:** So --
>
> **NESBIT:** That's all.
>
> **CORPORAL BRAY:** --you're a smart kid, right?
>
> **NESBIT:** Yeah.

*(Footnote Continued Next Page)*

J-S16043-21

to affirmatively seek clarification of an arrestee's equivocal assertion, nor are

they required to stop questioning when a "suspect might want a lawyer." ***See***

_____

    **CORPORAL BRAY:**    In here I say that you can decide at any time to exercise these rights and not enter – answer any questions or make any statement.  So you understand that?  So that means, if you don't like a question, you don't' have to answer it.

    **NESBIT:**    All right.  I understand.

    **CORPORAL BRAY:**    If you -- If you don't -- if you're just done, you don't want to hear anything more, you say, I'm done.  Okay?

    **NESBIT:**    All right.

    **CORPORAL BRAY:**    But I still – again, I can't come and try and get you to talk to me again after you want a lawyer to do it.  So I didn't do that.  Your said, as we were walking out of here – what did you say?

    **NESBIT:**    That's because I wasn't sure.  So I said, oh, okay, well, we can talk.

    **CORPORAL BRAY:**    Okay.

    **NESBIT:**    And --

    **CORPORAL BRAY:**    So do you want to like – do you want to talk to us without a lawyer right now?

    **NESBIT:**    Uh, yeah, but at any point if I feel that it's questions I don't want to answer, then --

    **CORPORAL BRAY:**    Exactly.  That's what these rights tell you, that's why we read them to you, so you understand them.

    **NESBIT:**    All right.  I understand.

N.T. at 3-4. (emphasis added).

- 20 -

*Commonwealth v. Lukach*, 195 A.3d 176, 189 (Pa. 2018) (discussing jurisprudence declining to adopt a rule requiring police to further question suspects in attempt to clarify ambiguous references to counsel). *See also Davis v. United States*, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (mandating an officer not be forced "to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong").

In this regard, the facts of the case *sub judice* are distinguishable from those in *Lukach*, wherein the Pennsylvania Supreme Court held that police impermissibly induced the arrestee into speaking through coercive questioning after he had clearly and unambiguously invoked his *Miranda* right to remain silent.

In *Lukach*, the defendant, a prime suspect in a homicide investigation, was brought into the police station for an interview and read his *Miranda* rights. He began the interview by issuing general denials of any involvement with the crime, but he then indicated he no longer wished to speak to the investigators:

> **CHIEF**: And at some point you have a responsibility to yourself like we talked about but also your family and also your mom.
>
> [**LUKACH**]: I know.
>
> **CHIEF**: For as much shit as you've been in, I'm guessing you haven't cut her out of your life. You still care there.
>
> [**LUKACH**]: Yeah a little bit.

**CHIEF**: It's not perfect right.

**[LUKACH]: Yeah. I don't know just, I'm done talking. I don't have nothing to talk about**.

*Id.*, at 179.

The police chief, however, persisted in an extensive dialogue that, while not comprising direct questioning, still constituted interrogation in the view of our Supreme Court, "as they were 'words or actions ... that the police should know are reasonably likely to elicit an incriminating response[.]' *Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 322 (2011), *quoting Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)." *Lukach*, 195 A.3d 176, 181. The continued interrogation consisted of the following statements:

**CHIEF**: You don't have to say anything, I told you that you could stop.

**LUKACH**: Ok.

**CHIEF**: Let me explain to you then, alright?

**LUKACH**: [Y]eah.

**CHIEF**: We don't believe you right now.

**LUKACH**: Uh huh.

**CHIEF**: And we are in the process of getting our stuff back from the lab and we are in the process of interviewing other people who want to give us information. So as that's being put together and it suggests that you are involved, you lose your right to tell me something different. You lose your right to distance yourself from anything that you weren't directly involved with. You lose your right to control what happens to you for however many years however long.

**LUKACH**: Yeah.

**CHIEF**: And I've talked to people like this before and they've made the wrong choice with not speaking to me and I will tell them everything else that is going to happen to them because we are arresting them and because we have the evidence and they start bawling and they say they want to talk now. And I'm going to tell you that the answer to that is no.

**LUKACH**: Yeah.

**CHIEF**: Because you['re] a kid from the street and you know how respect works. Respect is me now sitting with you and giving you a chance. You disrespect me by lying and I'm not gonna give you another chance because you are a man now.

**LUKACH**: Yeah.

**CHIEF**: You get one. That's where we are going from here and that's how it's gonna play out. [The time is] 1:30.
20 Second Pause (silence)

**CHIEF**: I'm hoping we get a call here pretty soon from the lab about some[ ] of this stuff.

**LUKACH**: Yeah

**CHIEF**: We will wait a couple minutes with you.

**LUKACH**: Alright.

**CHIEF**: And then when they call if they say that stuff is there indicating that you were in the area, or [Thomas], because you said you were with him all night.

**LUKACH**: Yeah.

**CHIEF**: Then at the point, we are not working on any kind of.. We aren't going to come from the direction of trying to help you anymore.

**LUKACH**: Yeah.

***Commonwealth v. Lukach***, 195 A.3d at 179–80.[9]

The Supreme Court agreed with this Court's conclusion that the continuing interrogation by the police chief "was 'meant to pressure [Lukach] into relinquishing his right' and 'the statements [Lukach] thereafter made were 'the product of compulsion, subtle or otherwise.'" ***Id.*** at 181 (citations omitted).

However, the Supreme Court made this determination only after it first conducted an inquiry into whether Lukach had offered an unequivocal ***Miranda*** assertion and, thus, invoked his right to remain silent. It is this inquiry that is central to our purposes in the case *sub judice.*

To this end, the Court conducted a review of non-binding, extra-jurisdictional decisions addressing the question of whether a defendant's assertion of either a right to silence or right to counsel was rendered equivocal by accompanying language that could be construed as qualifying the statement. Distinguished were cases involving assertions prefaced with colloquial or conversational phrases, such as "*I think* I want a lawyer" or "*I'd rather* not talk about it" followed by "I don't want to talk about," which were held not to make an assertion equivocal, from cases in which language

---

[9] Though Corporal Bray's eventual interrogation of Nesbit similarly involved indirect questions and statements designed to persuade Nesbit to provide a full statement about his involvement in the crime committed, Nesbit had not yet made an unequivocal assertion of his ***Miranda*** rights as the defendant in ***Lukach*** had done.

indicated an intent to modify or limit the assertion, such as "Nah, I don't want to talk, man. *I mean, I . . . .*" **Lukach**, at 181-187.

This latter statement was addressed in the 8th Circuit Court of Appeals decision in **United States v. Adams**, 820 F.3d 317 (8th Cir. 2016), in which the 8th Circuit Court of Appeals held the defendant's addition of a qualifier injected doubt into his prior assertion, thus rendering it equivocal. **Lukach** summarized the pertinent facts of **Adams**, as follows:

> In **Adams**, the defendant was arrested for bank robbery, informed of his **Miranda** rights, declined to answer questions, and the interrogation was terminated. 820 F.3d at 320. Two weeks later, an FBI agent visited Adams in jail, advised him of his **Miranda** rights, and began questioning him. **Id.** About six minutes into the questioning, Adams stated **"Nah, I don't want to talk, man. I mean, I..."** **Id.** The FBI agent cut Adams off at that point and continued to question him, and Adams responded to the questions. **Id.** at 321. The interview continued for another sixteen minutes, during which Adams stated he was innocent and that he sold his white Dodge Durango — a vehicle which had been seen parked at the bank — prior to the robbery. **Id.** at 321-22. **The Eighth Circuit Court of Appeals affirmed the denial of Adams's motion to suppress his confession to the FBI agent, finding "[t]he phrase 'I mean' signaled that Adams intended to clarify the statement, 'I don't want to talk, man,' and the statement was therefore ambiguous."** **Id.** at 323. The court further found relevant the fact that Adams "continued to talk with [the FBI agent] for an additional sixteen minutes, never clarifying his earlier statement or otherwise unequivocally invoking his right to remain silent." **Id.**

**Lukach**, 195 A.3d at 187 (2018) (emphasis added).

Whereas **Lukach** held that the prefatory "I don't know" uttered by the defendant in its case was most akin to the merely conversational/colloquial language which the former group of decisions had deemed immaterial to the

accompanying assertion of **Miranda** rights, we find in the present case that Nesbit's follow-up statement most resembles that of **Adams**, in which the 8th Circuit deemed the trailing comment, "I mean, I . . ." a modifier of the initial assertion of a right to silence, rendering the assertion equivocal.

Nesbit's second statement has the same effect. As discussed *supra*, his offering of, "I mean, we can. . .", immediately after Corporal Bray had just indicated all questioning would stop, would signal to a reasonable officer that Nesbit was suggesting a possible willingness to modify his assertion, to talk to some degree; it revealed a "pondering" or "contemplation" of the option of continuing the present interview, in some form, without a lawyer.

An unequivocal assertion of one's right to counsel during a police interrogation is a demand to stop the interrogation. So, when Nesbit voluntarily resumed relevant communications despite the assertion he had just made, and did so with words apparently meant to modify or clarify his assertion, it is reasonable to conclude here, just as the 8th Circuit did in **Adams**, that he had not yet, at that moment, expressed a settled purpose of ending the interview until a lawyer is present.

With respect to whether Nesbit thus voluntarily waived his **Miranda** rights, we note that our Supreme Court has set forth the following principles governing the waiver of **Miranda** rights in the setting of a custodial interrogation:

> When a defendant challenges the admission of a statement made during a custodial interrogation, the Commonwealth bears the burden to prove by a preponderance of the evidence that the

defendant's *Miranda* waiver was knowing, intelligent, and voluntary. We engage in a two-part inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

> An examination of the totality of the circumstances includes a consideration of (1) the duration and means of an interrogation; (2) the defendant's physical and psychological state; (3) the conditions attendant to the detention; (4) the attitude of the interrogator; and (5) any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Commonwealth v. Smith*, 210 A.3d 1050, 1058 (Pa. Super. 2019) (citations omitted and formatting altered). "This Court has applied the totality of circumstances test with no less force or vigor in cases where there was a claim that a promise or inducement rendered the confession involuntary." *Commonwealth v. Templin*, 795 A.2d 959, 964 (Pa. 2002) (citation omitted). Further, with respect to improper inducement of *Miranda* waiver:

> Promises of benefits or special considerations, however benign in intent, comprise the sort of persuasions and trickery which easily can mislead suspects into giving confessions. The process of rendering *Miranda* warnings should proceed freely without any intruding frustration by the police. Only in that fashion can we trust the validity of subsequent admissions, for if the initial employment of *Miranda* is exploited illegally, succeeding inculpatory declarations are compromised. Misleading statements and promises by the police choke off the

> legal process at the very moment which ***Miranda*** was designed to protect.

***Commonwealth v. Lukach***, 195 A.3d 176, 192 (Pa. 2018) (citation omitted).

Again, at the very outset of the interrogation, the interview consisted only of Nesbit receiving ***Miranda*** warnings for the second time, his stating his preference for a lawyer, and his immediate qualification of that stated preference once Corporal Bray informed him that all questioning would stop. While Nesbit acknowledged a moment later that he was mindful that his words could be used against him, as he was so advised, this comment did not negate his insinuation that he would be interested in some form of communication with the corporal. Under this record, we discern no improper inducement of Nesbit's early decision to retreat from unequivocally asserting his ***Miranda*** right to counsel.

Having thus determined that a reasonable officer in Corporal Bray's position could infer that Nesbit voluntarily left open the channels of communication between himself and the corporal at the outset of the custodial interrogation, we conclude that the trial court erred when it opined that the merits of Nesbit's Omnibus Motion seeking the suppression of all statements made during the custodial interrogation were "so apparent" that the interests of justice required the court to accept the motion for merits review despite its gross untimeliness.

Accordingly, we reverse the trial court's order of November 25, 2020 to the extent it dismissed the Commonwealth's Motion to Dismiss and granted Nesbit's Omnibus Motion to suppress, and remand for further proceedings.

Order reversed.  Case remanded.  Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/23/2021