J-A08027-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KIMBERLY SUE WILLIAMS | : | |
| | : | |
| Appellant | : | No. 313 WDA 2022 |

Appeal from the Judgment of Sentence Entered October 11, 2021
In the Court of Common Pleas of Clearfield County
Criminal Division at No(s):  CP-17-CR-0001181-2019

BEFORE:   STABILE, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SULLIVAN, J.:                **FILED: DECEMBER 8, 2023**

Kimberly S. Williams ("Williams") appeals from the judgment of sentence imposed following her convictions for involuntary manslaughter and recklessly endangering another person ("REAP")[1] in the death of her husband, Ronald Williams ("Ronald").  We affirm.

On a day in March 2019, Williams called the police to report that Ronald had just shot himself in the head.  **See** N.T., 6/15/21, 66-69.  Police who responded to the scene found Ronald's body in a hospital bed with a gun in his hand and a gunshot wound to his right temple.  **See id**. at 68, 95, 97.  A paramedic arrived and found Ronald's body cold to the touch, inconsistent with a recent shooting.  **See id**. at 119, 121.  Williams told the paramedic Ronald had a history of mental illness and shot himself in the head in her

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. §§ 2504(a), 2705.

presence. *See id*. at 128-29. An examination of the gun showed that a second shot had misfed. *See id*. at 160-61. Williams told the coroner that Ronald, a quadriplegic, had diabetes, could use only his right arm, and had threatened to shoot himself for the past few days. *See id*. at 184-85.

Dr. Harry Kamerow performed Ronald's autopsy and testified he did not find stippling[2] consistent with a contact wound or suicide. *See* N.T, 6/16/21 (Kamerow)[3], at 6-12. Dr. Kamerow testified that he determined that the fatal bullet had been fired at greater than Ronald's arm's length and constituted a distant contact wound, and that Ronald had not died immediately. *See id*. at 13, 18-25, 53, 65, 82.[4]

Dale Wimer ("Wimer"), an expert in gunshot residue, testified stippling would have been found on Ronald's body if the gun had been fired within six feet of its target, and that gun residue ceases to be present at some point between forty-eight and seventy-two inches of distance between a gun and its target. *See* N.T., 6/22/21, at 64, 66, 70-77, 88-95, 102. Wimer also

_____

[2] Stippling "is gunshot residue consisting of the unburned powder and debris that is discharged from a firearm that is 'tattooed' onto a shooting victim's skin in the form of pinpoint abrasions." *Commonwealth v. Murray*, 83 A.3d 137, 156 n.7 (Pa. Super. 2013).

[3] Dr. Kamerow's June 16, 2021 testimony was separately transcribed.

[4] The police originally believed Ronald's death to be a suicide and did not preserve the crime scene. They later determined the death to be a homicide. *See* N.T., 6/15/21, at 86-89; N.T., 6/16/21, at 66-68.

testified that the .22 caliber semi-automatic used to kill Ronald required 3.2 pounds of trigger pressure. *See id*. at 75.

Tara Helsel, a forensic scientist, testified Ronald's body had no gunshot residue but Williams had one two-component particle on her left palm, which could be gunshot residue, and, further, that a dress taken from the house had traces consistent with gunshot residue on the left sleeve and back-of-skirt area. *See* N.T., 6/18/21, at 47-49, 55-57, 66-67.

In September 2017, Ronald received approximately $1.5 million from a personal injury settlement as a result of a hospital's failure to diagnose a stroke that rendered Ronald a quadriplegic. *See id*., at 79-84. A special needs trust ("the Trust") received a substantial portion of that settlement money to be used exclusively for Ronald's continued care. *See id*. at 85-88; N.T., 6/17/21, at 169. James Wilkinson ("Wilkinson"), the Trust's Account Administrator, testified that at times Williams charged the Trust for items not related to Ronald's care and regularly exceeded the monthly credit card limit, which resulted in multiple conversations between Wilkinson and Williams about what expenses the Trust could pay. *See* N.T., 6/17/21, at 26-27, 37, 93-96. In December 2018, Ronald told Wilkinson he wanted to make a will without Williams's knowledge. *See id*. at 28-29. The next month, however, Ronald signed a will in Williams's presence. *See id*. at 30-34.

On the day he died, Ronald emailed Wilkinson and wrote, "if anything happens to me, please have an autopsy done . . . I can't prove anything but

- 3 -

something isn't right." *See id*. at 60. Ronald also wrote that he wanted to change his will, which left the majority of his assets to Williams. He also stated that he wanted someone else to care for him. *See id*. In previous conversations, Ronald had told Wilkinson he wanted to exclude Williams from his will. *See id*. at 60-64, 139, 146, 173. Wilkinson arranged for a lawyer to visit Ronald the following week. *See id*. at 64. However, a few hours later after Wilkson spoke with Ronald, Williams called Wilkinson to say she had read Ronald's email and told him that Ronald shot himself in the head; she said Ronald would be buried the next day without an autopsy. *See id*. at 68. Wilkinson called the police. *See id*. at 72.

Miranda Williams ("Miranda"), Williams's and Ronald's daughter, testified that following Ronald's stroke Williams had an ongoing extra-marital relationship and often took Ronald from the home and put him in in-patient rehabilitation so that she could go places without him and, according to Ronald, entertain a man in the home. *See id*. at 120-22. On the day of his death, Ronald sent Miranda a Facebook message that read, "There's something wrong with me, I'm not right. If something happens to me, contest the will[;] your Mom keeps telling me she hates me[.] I don't feel right. I think she's trying to kill me." *Id*. at 124.[5] On other occasions, however,

---

[5] Williams did not object to this testimony.

Ronald had shared with Miranda his feelings of depression and gratitude for Williams's care. *See id*. at 126-29.

Nicole Twoey-Cieslwicz ("Twoey-Cieslwicz"), Ronald's occupational therapist for the final two-and-one-half to three years of his life, found Ronald unusually fatigued on the day he died and asked Williams for a list of his medications. *See* N.T., 6/17/21, at 190.[6] Twoey-Cieslwicz testified Ronald did not appear to be depressed, nor did he have a persistent obsession with death. *See id*. at 191-92. Eric Raydo ("Raydo"), Ronald's occupational therapist, confirmed Twoey-Cieslwicz's testimony that Ronald loved guns, *see id*. at 193-95, and stated that Ronald kept numerous handguns in a cabinet in a gun room in the house and usually had a 9-millimeter or a .45 caliber gun within reach, which he said he needed for self-defense. *See id*. at 211-18.[7] Raydo testified Williams would help Ronald assemble guns, carried a gun herself, and went shooting with him. *See id*. at 218, 229. In Raydo's opinion, Ronald did not have the strength to hold a gun to his head on the day of his

---

[6] Williams's texts to her lover, Terry Carter ("Carter"), demonstrated in January 2019, two months before Ronald's death, she drugged Ronald so she could go to Carter's hotel room. Williams texted she gave Ronald "2 Benadryl, 5 10 milligram melatonin, 2 muscle relaxers", but "I can't get this asshole to sleep no matter what I do." *See* N.T. 6/21/21, at 183.

[7] Raydo testified that Ronald disliked .22s, the type of gun that killed him, because they lacked sufficient power. *See id*. at 211-18.

death. *See id*. at 198-99. Raydo testified that toward the end of his life, Ronald got rid of his regular semi-automatic weapons because he could not "rack" them. *See id*. at 222.

The police interviewed Williams on the night of Ronald's death. She said she did not kill Ronald for the money but admitted that Ronald's death was the only means from which she could inherit. *See id*. at 121, 126, 129-30. Williams told the police she was having a sexual relationship with Terry Carter ("Carter"), a high school friend who lived in the South, and that Carter had been to her house in the last week and was staying in a hotel in town. She denied hurting Ronald, who she said emotionally abused her during their twenty-seven-year relationship. She said that about forty-five minutes before his death, Ronald threatened to kill himself and pointed a gun at her when she said she would put him in a nursing home. She stated he had pointed a gun at her multiple times during their relationship. Williams said that she had Ronald involuntarily committed in the late 1990s, testimony that other evidence confirmed. *See* N.T. 6/21/21, at 144. Williams claimed Ronald shot himself when she looked away. *See id*. at 121-37.

A defense psychologist testified he treated Ronald from December 2018 until February 2019 for bipolar disorder, obsessive-compulsive disorder, and generalized anxiety disorder. The psychologist testified that Ronald manifested an excessive fear of dying (not a wish to die), which did not

improve during his treatment. The doctor testified he believed Ronald's frequent denials that he had suicidal ideation. *See* N.T., 6/18/21, at 10-20, 23-26. A defense pathologist testified that Ronald's wound was consistent with a contact wound, and that the direction of the bullet's path was consistent with suicide. *See* N.T., 6/21/21, at 23, 32-33, 45, 51.

Carter testified that Williams texted him using her sister's name to conceal the contact from Ronald, and they began having sexual relations in September 2018. *See id*. at 176-79. Carter testified he visited Williams's and Ronald's house that month when Ronald was away at "some kind of therapy/sauna place." *See id*. at 180. Carter and Williams met up again for sex in Virginia in November 2018 and in Pennsylvania in January 2019; Carter checked into a hotel near Williams's and Ronald's home two days before Ronald's death. *See id*. at 181-82, 186. Carter claimed that Ronald sanctioned his relationship with Williams. *See id*. at 224-25. Carter testified that two weeks before Ronald's death, Williams wrote to him, "I think I will be coming to you as soon as the money is situated." *Id*. at 230. In another message to Carter, Williams wrote, "[R]on makes it so fucking hard not to kill him let alone love him." *Id*. Carter testified that in another message the day before the killing, Williams told him she had drawn her gun on Ronald that day. *See id*. at 190.

Prior to trial, Williams moved to suppress her statements to police. At the hearing on the suppression motion, Trooper Frederick Burns testified that he reported to Williams's house in response to the shooting and returned later that evening with Trooper David Patrick. Trooper Burns testified Williams said to the troopers, "I'm not surprised you guys are back. I expected you to be back." *See* N.T., 7/24/20, at 20-22. According to Trooper Burns, the troopers asked Williams if she would be willing to return to the barracks for an interview and she said, "Yes." Trooper Burns said they offered her transportation to the barracks. *See id*. at 23. Burns testified the troopers transported Williams approximately nine miles from her home to the barracks without handcuffing her, *see id*. at 76, and once there, she signed a notification of non-arrest form indicating her awareness she was not under arrest, detained, or in custody, was free to leave the troopers' presence at any time, and that she voluntarily decided to answer questions concerning Ronald's death. *See id*. at 23-25. Trooper Burns testified the troopers began a videorecorded interview of Williams, and Williams had her cell phone and a tablet with her throughout the interview. *See id*. at 25-27.

During the interview, Williams said, "I wanted him to stop hurting. I wanted him to," and the trooper responded, "That's what you wanted and that's what you got. He doesn't." Williams said, "If I was gonna hurt [Ronald], it would not have been that way. . . . I won't even kill a fucking spider . . . .

This is over. I'm going home. I'll get a lawyer. I did not hurt my husband and I never would hurt my husband." *See id*. at 74-75. A trooper responded, "You can have a seat out there and someone will give you a ride back, al[l] right." *Id*. at 75. A trooper opened the door for Williams and she walked out of the interview room and into the lobby. *See id*. at 38-39. Out in the lobby, troopers discussed a gunshot residue test with Williams, and she agreed to the test. *See id*. at 93.

Shortly thereafter, Trooper Randy Powell ("Trooper Powell"), spoke to Williams about the test and she said, "No[,] I want you to get this. I can't figure out why they didn't do this today at my house." *Id*. at 93-94; Joint Exhibit 2 at 75. As Trooper Powell was taking the sample from Williams's hands, she said, "27 years I've been married to him . . . Since [I] was 17 fucking years old . . .. He always had to do anything to hurt me." *Id*. Trooper Powell said he did not think it would be a good idea for Williams to stay alone in the house that night and asked if she had someone to call to stay with her that night. He said, "[I] have some concerns about you going alone." N.T., 7/20/20, at 77. Williams assured the trooper she would not kill herself and stated that Ronald was "such an asshole. I love him but he was an asshole." *Id*. Williams then pulled out her phone to show the trooper some of Ronald's texts and began talking to him. *See id*. at 78. When her conversation with

Trooper Powell concluded, Williams went home with her sister. *See* N.T., 7/24/20, at 30.

The trial court denied Williams's suppression motion. After a seven-day trial, the jury found Williams not guilty of murder, aggravated assault, and simple assault, and convicted her of involuntary manslaughter and REAP. The trial court later imposed a sentence of 302 to 604 days of imprisonment followed by three years of probation; the court also imposed the costs of prosecution.[8] Williams timely filed a post-sentence challenge to the imposition of the costs of prosecution; it was denied by operation of law. Williams timely appealed, and she and the trial court complied with Pa.R.A.P. 1925.

On appeal, Williams presents the following issues for our review:

1)    Did the trial court commit an error of law based on insufficient weight and evidence to support the verdict by:

    a.    accepting and adopting a new theory of the case to find sufficient evidence existed to establish a conviction;

    b.    accepting and adopting a new theory of the case to find the verdict was not against the weight of the evidence;

    c.    improperly convicting [Williams] of involuntary manslaughter and recklessly endangering another person based on a theory not recognized by law;

    d.    finding that [Williams] committed an affirmative act that resulted in death to support the charges of involuntary manslaughter or recklessly endangering another person?

---

[8] Williams failed to state in her brief the exact amount of the costs imposed.

2)     Did the trial court commit an error of law by not issuing a reasoned decision to support [that Williams] should be responsible for the cost of the prosecution where the bulk of the costs assessed were incurred in pursuit of criminal charges for which [Williams] was acquitted?

3)     Did the trial court commit an error of law by failing to instruct the jury that [Williams] would be required to hold the gun or pull the trigger to support a finding of guilt with respect to involuntary manslaughter as [Williams] had no legal duty to act after the jury submitted this question?

4)     Did the trial court err in denying [Williams's] motions to suppress raised in pre-trial motions?

Williams's Brief at 4-5 (some capitalization omitted).

Williams's first issue raises a combined sufficiency and weight challenge.

This Court reviews the sufficiency of the evidence under the following standard:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. . . . [W]e may not weigh the evidence and substitute our judgment for the fact-finder. . . . The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014) (citation omitted).

A person commits involuntary manslaughter when, *inter alia*, as a direct result of the doing of a lawful or unlawful act in a reckless or grossly negligent manner, she causes the death of another person. **See** 18 Pa.C.S.A. § 2504(a). A person acts recklessly when she consciously disregards a substantial and unjustifiable risk that a material element exists or will result from her conduct. That risk must be such, considering the nature and intent of her conduct and the circumstances known to her, that disregard of the risk is a gross deviation from a reasonable person's standard of conduct. **See** 18 Pa.C.S.A. § 302(b)(3). The Supreme Court has construed "gross negligence" to be the equivalent of recklessness for the purposes of involuntary manslaughter. **See Commonwealth v. Huggins**, 836 A.2d 862, 868 (Pa. 2003).

Williams asserts that: the verdict slip and a question the jury asked proved that it convicted her based on a theory of omission, *i.e.*, failing to protect Ronald from harm; and the Commonwealth's sole theory of liability was that she intentionally shot Ronald, but there was no evidence that she acted recklessly or with gross negligence. She also asserts there was no evidence she gave Ronald the gun or that his suicide was foreseeable, and she was not given notice to defend against a theory of liability dependent upon giving Ronald a gun recklessly.

The trial court rejected Williams's claim because the evidence was sufficient to prove that Williams's conduct was directly and substantially linked

to Ronald's death because the jury could have concluded she was reckless or grossly negligent in giving Ronald a gun. *See* Trial Court Opinion and Order, 2/17/22, at 3-6.

We affirm the trial court's ruling although we do so on different grounds than relied upon by the court.[9] Viewing all of the evidence and reasonable inferences in the light most favorable to the Commonwealth as verdict winner, the evidence that Williams caused Ronald's death in a reckless or grossly negligent manner included proof that: Williams pulled a gun on Ronald the night before; Ronald could not have reached his arm far enough away from his body to eliminate the presence of stippling in the fatal wound; Williams had powder burns on her palm and dress; Williams had experience firing guns; Ronald expressed fear that Williams was trying to kill him and his desire to cut her out of his will and Williams had a lover she wanted to be with and whom she had drugged Ronald to see. That evidence would have allowed the jury to decide that Williams shot at Ronald but did so only to scare him, or in disregard of a substantial and unjustifiable risk of killing him, and that she killed him while doing so. *See* 18 Pa.C.S.A. §§ 2504, 302(b)(3). Alternatively, the jury may have convicted Williams of involuntary

---

[9] It is well-settled that where the result is correct, we may affirm a lower court's decision on any ground whether or not relied upon by that court. *See* **Commonwealth v. Lehman**, 275 A.3d 513, 520 n.5 (Pa. Super. 2022).

manslaughter rather than murder as an exercise of lenity. *See United States v. Powell*, 469 U.S. 57, 68-69 (1984) (holding that a criminal defendant cannot attack a conviction on one count because it is inconsistent with the jury's verdict of acquittal on another count); *Commonwealth v. Moore*, 103 A.3d 1240, 1244 (Pa. 2014) (stating that an inconsistent verdict does not by itself render evidence insufficient to sustain a particular conviction). *See also Commonwealth v. Shaffer*, 420 A.2d 722, 724 (Pa. Super. 1980) (stating that "(a)n acquittal cannot be interpreted as a specific finding in relation to some of the evidence," and that consistency in a jury's verdicts in a criminal case is unnecessary provided there is sufficient evidence to support the conviction the jury has returned) (internal citation omitted).[10]

That the jury asked a question about whether involuntary manslaughter required proof that Williams held the gun or pulled the trigger does not prove that the jury convicted Williams based on an omission rather than an act. The court charged the jury that involuntary manslaughter required proof of an action, and the jury is presumed to follow the trial court's instructions. *See*

---

[10] Williams's focus on the Commonwealth's argument is misplaced. It is the evidence, not the arguments of the parties, that must be sufficient to sustain a conviction. *See e.g. Commonwealth v. Keaton*, 729 A.2d 529, 539 (Pa. 1999) (stating that arguments of counsel are not evidence). Further, Williams was not deprived of the opportunity to defend against a charge of involuntary manslaughter; the offense was charged and she was not limited in her ability to advance a defense to that charge.

*e.g.*, ***Commonwealth v. Jones***, 668 A.2d 491, 504 (Pa. 1995).  There is no basis on the record to conclude the jury convicted Williams based on a theory of omission.[11]

Williams also includes a single sentence intermingled with her sufficiency claim merely framing the weight of the evidence standard.  ***See*** Williams's Brief at 14.  It is well settled law that this Court will not accept the implicit invitation to act as Williams's counsel and make a weight argument for her.  ***See*** Pa.R.A.P. 2119(a); ***see also Commonwealth v. Bradley***, 232 A.3d 747, 756 (Pa. Super. 2020) (declining to review claim where appellant failed to relate the law to the facts of his case); ***Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007) (stating that this Court "will not act as counsel and will not develop arguments on behalf of an appellant").  Thus, any weight claim is waived for lack of development.  ***See*** Pa.R.A.P. 2119(a); ***Bradley***, 232 A.3d at 756; ***Commonwealth v. Hardy***, 918 A.2d at 771.

Williams's next issue asserts the trial court erred in assessing her with various costs incurred in the prosecution of her case.  Pursuant to both 16 P.S. § 1403, and 16 P.S. § 7708, when a defendant is convicted and sentenced to pay the costs of prosecution and trial, the district attorney's expenses shall be considered part of those costs.  The Commonwealth bears the burden of

---

[11] A similar analysis applies to Williams's REAP conviction, which she does not separately contest.

justifying, by a preponderance of the evidence, that the imposition of costs on a defendant is proper. **See Commonwealth v. Gill**, 432 A.2d 1001, 1004 (Pa. Super. 1981).

Williams asserts that the trial court improperly assessed her with various costs of prosecution, including trace gunshot residue testing and expert testimony. She cites **Commonwealth v. Smith**, 361 A.2d 881 (Pa. Super. 1976), for the proposition that a person acquitted of murder but convicted of possessing a firearm, a misdemeanor, cannot be required to pay the cost of the felony of which he is acquitted.[12] Williams says there was no evidence that she unintentionally shot Ronald or accidentally fired the gun, and if the jury determined that she did not pull the trigger, as her acquittal of the more serious charges suggests, involuntary manslaughter and REAP did not require testing for gunshot residue.

The trial court concluded that a district attorney is entitled to recover the costs of prosecution when a defendant is convicted. **See** Trial Court Supplemental Opinion, 2/22/22, at 2, citing 16 P.S. § 1403. It stated that **Smith** limits payment to costs necessary for the prosecution of the offenses of which the jury convicted Williams. The court found that the pathologist's testimony was necessary to establish Ronald's cause of death, and that the

---

[12] Williams's involuntary manslaughter conviction is a misdemeanor of the first degree. **See** 18 Pa.C.S.A. § 2504(b).

- 16 -

jury could have concluded that Williams handled the gun during the shooting, making the testing of Williams's and Ronald's hands for gunshot residue necessary. Accordingly, the costs could not be divided or apportioned between an involuntary manslaughter that was committed with a gun, the offense of which the jury convicted Williams, and a murder committed with a gun, the offense of which the jury acquitted her. **See id**. at 2-5, citing **Commonwealth v. Soudani**, 165 A.2d 709, 711 (Pa. Super. 1960). The trial court therefore required Williams to pay those costs.

We review a trial court's imposition of costs of prosecution for an error of law. **See Commonwealth v. duPont**, 730 A.2d 970, 987 (Pa. Super. 1999). We find that record supports the trial court's determination. Williams was acquitted of maliciously killing Ronald with a gun but convicted of involuntary manslaughter involving a gun. As discussed, the lesser verdict may have been the result of lenity or the jury's conclusion that Williams fired the gun but did so in a reckless or grossly negligent manner causing Ronald's death. The verdict does not allow the determination of the jury's theory of liability, but testing to determine if Williams had gun residue on her clothing, the distance from which the gun was fired, and reconstruction of the scene of the shooting was relevant to both charges. As the case Williams herself cites states, "[i]f the instant case presented a situation of virtually identical charges requiring substantially the same proof, we could merely affirm the imposition

of all costs on the appellant." **Smith**, 361 A.2d at 883. **Smith** supports the trial court's imposition of the specified costs of prosecution on Williams.

Williams's third issue concerns the trial court's instruction to the jury, specifically its involuntary manslaughter instruction. We must first determine if we have jurisdiction to review Williams's claim. Our Supreme Court has held that issues not raised in the trial court cannot be raised for the first time on appeal. **See** Pa.R.A.P. 302(a); **Commonwealth v. Dennis**, 695 A.2d 409, 411 (Pa. 1997). This rule of issue preservation is not a mere technicality; as the **Dennis** Court explained, it serves to prevent unfair advantages and conserve judicial resources:

> [w]e have explained that if appellate courts were to consider issues not raised in the trial court, then the trial would become a dress rehearsal and would give an unfair advantage to the ill-prepared advocate. Further, trial courts should be given the opportunity to correct an error and conserve judicial resources.

**Id**. (internal citations omitted). Specifically with regard to Williams's jury instruction claim, an appellant must object to the instruction at trial to preserve a challenge to that instruction on appeal. **See Commonwealth v. Davis**, 273 A.3d 1228, 1246 (Pa. Super. 2022). Further, a general objection to a jury charge will not preserve an issue for appeal; a specific exception must be taken to the alleged improper language. **See** Pa.R.A.P. 302(a); **see also** Pa.R.Crim.P. 647(C) (providing that no portion of a jury instruction may

be assigned as error unless specific objections are made thereto before the jury retires to begin its deliberations).

Williams asserts that "in light of the facts presented at trial as well as the question the jury asked and [the] [t]rial [c]ourt's logic in denying post-sentence motions," the court should have read to the jury sections of the involuntary manslaughter instructions that address liability based on the failure to act. Williams's Brief at 24.[13]

We first examine whether Williams preserved a challenge to the trial court's jury instruction before the jury retired to begin its deliberations, as Pennsylvania Rule of Criminal Procedure 647(C) requires. At the conclusion of the presentation of evidence, the trial court conferred with counsel about the proposed points for charge, and Williams asked for multiple instructions. *See* N.T., 6/22/21, 171-84. When the court asked the parties if they were proceeding with an involuntary manslaughter instruction (the parties having agreed to withdraw voluntary manslaughter from the jury's consideration), the Commonwealth answered, "Yes," and Williams's counsel said, "Yeah. *I*

_____

[13] Williams also claims the court's subsequent explanation for denying her post-trial sufficiency claim – that she was reckless in giving Ronald a loaded gun – stated a theory of guilt other than that argued at trial. *See id*. at 24-27. Williams further argues the Commonwealth failed to establish direct causation or the requisite *mens rea*. *See id*. at 27-33. She concludes by citing the jury's question during deliberations and argues that the trial court should have instructed the jury on omission as a theory of guilt. *See* Williams's Brief at 33.

*mean I have no objection to including that.* I think it's – I don't think it applies, but I'm happy to address that —" *See id*. at 178 (emphasis added). When the trial court stated, "I suppose if I were you, I wouldn't have an objection to that either," Williams's counsel replied, "Yeah, no objection." *See id*. Nowhere on the record does Williams request the inclusion of the version of the jury instruction (omission) she now claims the court failed to give. *See id*. at 178-84.

Following closing arguments the next day, the court gave its jury instructions. At the conclusion of the instructions, the court asked counsel if they had "anything else" before the jury retired. Williams's counsel stated, "Nothing, Your Honor." *See* N.T., 6/23/22, at 144. The jury then retired to deliberate. *See Commonwealth v. Cosby*, 274 A.3d 372, 421-22 (Pa. Super. 2019) (stating that to preserve a challenge to a jury instruction, the appellant must object at the charging conference and before the jury retires to deliberate), reversed on other grounds, 252 A.3d 1092 (Pa. 2021). Williams thus waived her claim by failing to request the instruction she now claims she was improperly denied. *See* Pa.R.Crim.P. 647(C); Pa.R.A.P. 302(a).

Williams also failed to avail herself of other opportunities to request the instruction, beyond her failure to request the instruction at the charging conference, and before the jury retired to deliberate. The record shows when

the jury asked for a second reading of the involuntary manslaughter instruction, her counsel affirmatively stated that the court should **not** supplement the involuntary manslaughter instruction it had given. **See** N.T., 6/23/22, at 155. Specifically, the tipstaff told the court the jury wanted to be charged again on involuntary manslaughter; the court also learned that the jury wrote a note asking, "Did [Williams] have to be holding the gun or pull the trigger to be guilty of involuntary manslaughter?" **See** N.T., 6/23/22, at 155. The court termed the question "interesting" and invited input from the parties. **Id**. The Commonwealth indicated it did not know the answer to the question "[o]ff the top of our heads." Williams's counsel then stated:

> My position, we can't answer that for them. I mean, I know the elements of involuntary manslaughter; but even if I had an opinion on what the answer to that question is, it's not in the instructions, you know. That's for them to read the instructions and apply it to the facts and arrive at their own decision.

**Id**. When the court asked both parties if they agreed that "we cannot answer that question and it's up for them to determine what the true facts are and apply the law relative to the [c]ourt's instructions on the elements of voluntary manslaughter." Williams's counsel responded, "Yes." **Id**. The court then reread the involuntary manslaughter instruction it had given and told the jury it could not answer their question. **Id**. at 157-59. Williams made no objection to the second reading.

Here, where Williams made no request for the jury instruction to which she first claims entitlement on appeal, and affirmatively stated, in light of the jury's request for re-instruction, that the jury must be required to review the instructions already given and make its determination on that basis and made no request for the instruction to which she now claims entitlement, we find that Williams waived her claim of a defect in the trial court's involuntary manslaughter instruction and she has waived review of the claim on appeal. *See* Pa.R.A.P. 302(a); Pa.R.Crim.P. 647(C); *Dennis*, 695 A.2d at 411; *Davis*, 273 A.3d at 1246.[14]

Williams's final issue asserts that her entire police statement should have been suppressed for failure to inform her of her *Miranda*[15] rights, or the portion of her statement that followed her invocation of her right to counsel should have been suppressed.

When an appellate court reviews the denial of a suppression motion, the following principles apply:

> [O]ur initial task is to determine whether the [trial court's] factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that

---

[14] We thus do not reach the Commonwealth's alternative argument that Williams committed an affirmative action by placing a gun within the reach of Ronald, whom she had previously committed to a mental hospital for suicidal ideation.

[15] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Bryant*, 67 A.3d 716, 724 (Pa. 2013) (citation omitted).

A person is entitled to *Miranda* warnings only when she is subjected to a custodial interrogation. Custody occurs only when a person "is physically denied [her] freedom of action in any significant way or is placed in a situation in which [she] reasonably believes that [her] freedom of action or movement is restricted by the interrogation." *Commonwealth v. Cooley*, 118 A.3d 370, 376 (Pa. 2015). In making an objective assessment under the totality of the circumstances whether a detention has become so coercive as to constitute the functional equivalent of arrest, a court considers: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. *See Commonwealth v. Witmayer*, 144 A.3d 939, 948 (Pa. Super. 2016). The fact that a police investigation has focused on a particular individual does not automatically constitute "custody" requiring *Miranda* warnings. *See Commonwealth v. Baker*, 963 A.2d 495, 501 (Pa. Super. 2008).

Williams asserts the trial court erred in declining to suppress her entire police statement because she was subjected to custodial interrogation. She

asserts she was in custody because the police intended to secure her confession to murder, she was unable to leave the troopers' barracks of her own free will, she was at the barracks for more than three hours, the hour was late, she was in pain, and the troopers used psychological force on her. *See* Williams's Brief at 34-44.[16] Alternatively, Williams asserts that the portion of her statement after she said, "This is over. I'm going home. I'll get a lawyer" should have been suppressed, and that the police did not scrupulously honor that request by giving her *Miranda* warnings, ceasing questioning, and allowing a time lapse. *See* Williams's Brief at 44-51.

The trial court found that Williams was not in custody during the police interview. *See* Trial Court Opinion and Order, 11/20/20. at 8. The court cited the following factors: the troopers did not restrain Williams or make a show of force; Williams agreed to go to the troopers' barracks; Williams had her phone and tablet throughout the interview to seek a ride home and the troopers made multiple offers to arrange a ride; the troopers' questioning was not unreasonable nor would have caused her to conclude that her ability to leave was restrained; Williams signed a notification of non-arrest; and the

_____

[16] We note that Williams's 1925(b) statement asserted only that "[t]he trial court erred in denying [Williams's] motions to suppress raised in pre-trial motions." *See* Williams's 1925(b) statement, 4/12/22, at 3. We will ignore the deficiencies in Williams's 1925(b) statement because those deficiencies did not impede the court's review of Williams's claims.

troopers did not lock the door to the interview room. Williams was therefore not in custody and not entitled to the reading of **Miranda** rights. **See id**.

The court also rejected Williams's claim that the troopers' questioning should have ceased when she said she would get a lawyer. The court reasoned that because Williams was not in custody, the troopers were not required to give **Miranda** warnings. **See id**. at 9, citing **Commonwealth v. Sherwood**, 982 A.2d 483, 500 (Pa. 2009) (holding that exercise of **Miranda** rights need not be honored when a defendant is not in custody). The court also found that after she invoked her right to silence and left the room, Williams herself returned to the interview room and resumed discussing issues with a different trooper. **See** Trial Court Opinion and Order, 11/20/20, at 9-10.

We find support in the record for the trial court's conclusion that Williams was not subjected to custodial interrogation from the moment she was transported to the police station. Trooper Burns's testimony established that Williams told him, "I'm not surprised you guys are back, I expected you to be back," **see** N.T., 7/24/20, at 22, and agreed to be transported to the troopers' barracks, was not handcuffed, and signed a notification of non-arrest indicating her awareness of her freedom to leave the troopers' barracks, and voluntarily answered the troopers' questions. **See id**. at 22-27, 73. We do not find error in the court's conclusion that Williams was not subjected to

custodial interrogation upon being brought to the troopers' barracks because she was not in custody. **See Witmayer**, 144 A.3d at 948.

We also reject Williams's claim that the trial court erred by not suppressing the statements she made following her invocation of her right to counsel. After Williams stated, I'm going home. I'll get a lawyer," a trooper told her she could have a seat and someone would give her a ride home; she then walked out of the unlocked interview room and into the lobby. **See** N.T., 7/24/20, at 38-39, 74-75. Approximately three minutes later, Trooper Powell found Williams in the lobby of the barracks discussing a gunshot residue test with two troopers and Williams said, as she walked back to the interview room and apparently in response to a request for a swab of her hands for gunshot residue, "No[,] I want you to get this. I can't figure out why they didn't do this today at my house." **See id**. at 25, 93-94, 122; Joint Exhibit 2 at 75. After Trooper Powell repeatedly expressed his concern about Williams remaining alone in the house overnight and asked her to allow him to call someone to be with her, Williams resumed a discussion of her relationship with Ronald. She assured Trooper Powell that she would not commit suicide and resumed discussing her relationship and pulled out her phone to show the trooper some of Ronald's texts. **See** Joint Exhibit 2 at 77-78.

We agree with the trial court that Williams's stated intention to get a lawyer and go home did not convert her continued presence at the police

barracks into the functional equivalent of an arrest. Williams was not in custody when she made her remark. She did not have a Fifth Amendment right to counsel and was not entitled to **Miranda** warnings, which apply only when one is placed in custody. As the Supreme Court said in **Sherwood**, an appellant's statement that "I feel like I should have an attorney" does not trigger the right to counsel under the Fifth Amendment absent custody and does not trigger the Sixth Amendment right to counsel where no criminal charges have been filed, and thus, a statement mentioning counsel does not bar continued non-custodial questioning by police. **See Sherwood**, 982 A.2d at 500-01. **Sherwood** is dispositive of Williams's claims that her invocation of the right to counsel either rendered her presence at the troopers' barracks "custody" or barred any further questioning. We note that all of the cases Williams cites in support of her argument,[17] concern the invocation of the right to counsel during **custodial** interrogation. Because there was no custody

---

[17] **See** Williams's Brief at 44-48, citing **Commonwealth v. Boyer**, 962 A.2d 1213, 1216 (Pa. Super. 2008); **Commonwealth v. Lukach**, 163 A.3d 1003 (Pa. Super. 2017); **Edwards v. Arizona**, 451 U.S. 477 (1981); **McNeil v. Wisconsin**, 501 U.S. 171 (1991); **Commonwealth v. Henry**, 599 A.2d 1321, 1323 (Pa. Super. 1991); **Michigan v. Mosley**, 432 U.S. 96 (1975); **Commonwealth v. Russell**, 938 A.2d 1082 (Pa. Super. 2007); **Commonwealth v. Cohen**, 53 A.3d 882 (Pa. Super. 2012).

here, those cases are inapposite.[18]  Thus, we affirm the trial court's denial of Williams's suppression motion.

Judgment of sentence affirmed.

Judge Pellegrini joins this decision.

Judge Stabile concurs in the result.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>12/8/2023</u>

---

[18] We do not address the concept of a suspect's voluntary re-initiation of discussions while in custody because Williams was not in custody.  However, were we to do so, we would note that Williams voluntarily agreed to the testing of her hands and initiated a discussion of her relationship with Ronald after the test was concluded that belies the notion that she unequivocally conveyed to the troopers that she would not speak further without a lawyer.